[Cite as *State v. Vega-Medina*, 2024-Ohio-2808.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                              :

    Plaintiff-Appellee,              :

                                         No. 113320

    v.                                       :

LUIS VEGA-MEDINA,                          :

    Defendant-Appellant.            :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED IN PART; VACATED IN PART;
                  AND REMANDED
**RELEASED AND JOURNALIZED:**  July 25, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-671332-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Alexandria Serdaru, Assistant Prosecuting
Attorney, *for appellee.*

Joseph V. Pagano, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Luis Vega-Medina ("Vega-Medina"), appeals his convictions and sentence and claims the following errors:

> 1.  Appellant's convictions for kidnapping and abduction are against the manifest weight of the evidence.

2. Appellant was deprived of effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Section 10 of the Ohio Constitution.

3. Appellant's designation as a violent offender was improper.

4. Appellant's sentence is contrary to law.

{¶ 2} We affirm Vega-Medina's convictions but vacate his sentence and remand the case to the trial court to comply with the requirements of R.C. 2903.42(C).

## I. Facts and Procedural History

{¶ 3} In Cuyahoga C.P. No. CR-22-671332-A, Vega-Medina was charged with one count of kidnapping in violation of R.C. 2905.01(A)(3) (Count 1); two counts of abduction in violation of R.C. 2905.02(A)(1) and 2905.02(A)(2) (Counts 2 and 3); two counts of felonious assault in violation of R.C. 2903.11(A)(1) and 2903.11(A)(2) (Counts 4 and 5); one count of disrupting public services in violation of R.C. 2909.04(A)(3) (Count 6); one count of domestic violence in violation of R.C.2919.25(A) (Count 7); one count of assault in violation of R.C. 2903.13(A) (Count 8); and one count of aggravated menacing in violation of R.C. 2903.21(A) (Count 9).

{¶ 4} The case proceeded to a jury trial that ended in a mistrial due to Vega-Medina's alleged need for an interpreter. Approximately one month later, the court dismissed with prejudice the felonious assault charge alleged in Count 4. The case later proceeded to trial on all remaining counts.

{¶ 5} Officer Sean Donovan ("Officer Donovan"), of the Cleveland Police Department, testified that he responded to a home on Denison Avenue in Cleveland on May 27, 2022, pursuant to a 9-1-1 call. When he arrived on the scene, he found M.E.[1] crying hysterically in the garage. Officer Donovan observed bruising and marks on M.E.'s body, and M.E. reported that Vega-Medina had repeatedly hit her with his hands, a broom, and a belt. Officer Donovan authenticated photographs depicting M.E.'s injuries and video footage taken from his body camera when he arrived on the scene. These items were marked and admitted into evidence as exhibit Nos. 1 and 3 through 10.

{¶ 6} M.E. testified that she had been dating and living with Vega-Medina for nearly eight years when she learned that he was having an affair with another woman. She also stated that their relationship was "toxic" and that she had been trying to end it. M.E. described the incident giving rise to this case as follows:

> I was downstairs on the couch, and I heard him come inside the house. And he was upstairs for a little bit. And then I heard him coming down the steps. And I looked up and he had a broom in one hand and a belt in the other.
>
> And he approached me on the couch and asked me why I was on the couch. And I said, just leave me alone. I just want to be by myself. We're not together anymore.
>
> And he started hitting me with the broom and the belt —

(Tr. 318.)

---

[1] In accordance with this court's policy, initials are used herein to protect the privacy of the protected party.

{¶ 7} After beating M.E. with the broom and the belt, he ordered her to go upstairs. M.E. testified that she "willingly" complied with his orders because she was afraid of "what he was going to do to [her]." (Tr. 320.) She explained, "I was scared. I was fearing for my life." (Tr. 320.)

{¶ 8} M.E. attempted to call someone on her phone, but Vega-Medina took her phone away and said, "You're not calling anybody." (Tr. 321.) He then destroyed the phone and warned M.E., while holding a knife in his hand, that if she tried to call the police, he would stab her until she was paralyzed. (Tr. 321.) Vega-Medina directed her into a bedroom, threw her on the bed, and began suffocating her with a pillow. (Tr. 322.) Vega-Medina released M.E. from the bed, and she attempted to leave the bedroom, but he held the knife to her throat and told her that if she tried to leave, he would kill her and her mother. (Tr. 323.) Thereafter, he took the mattress, box springs, and nightstand and pushed them up against the door. (Tr. 323.) When asked if M.E. tried to get out, she replied, "I did not. I was afraid he would kill me." (Tr. 324.)

{¶ 9} According to M.E., Vega-Medina fell asleep and they spent the rest of the night in the bedroom with the door barricaded. M.E. did not sleep, but Vega-Medina was awakened when a family friend ("friend"), knocked on the front door. The friend testified that she lives near M.E. and that M.E.'s mother asked her to check on M.E. because she was not answering her phone. Vega-Medina opened the front door part way and asked her, "What do you want?" The friend asked to see M.E., and Vega-Medina eventually opened the door further. M.E., who had been

watching from the first-floor bedroom, ran out the door and got into the friend's car. The friend took M.E. to her house and called 9-1-1. According to the friend, they hid in the garage because they were afraid Vega-Medina had followed them to the friend's house.

{¶ 10} In the ensuing days, Vega-Medina sent several messages to M.E. on Facebook. Some of the messages, which M.E. authenticated at trial, stated:

> Just remember they can't make u do anything that you don't want too [sic] . . . you can always call them and let them know that you don't want to [sic][.]

> Are you going to court and help me out or what are you going to do? [o]r [sic] are you going to court and fuck me?

> I'm sorry that I'm putting you tru all this pain and hurt. . . . I didn't know it was this bad . . . .

> I have nothing against you. What you did is right. I'm not supposed to put my hands on you.

> Please come back I won't ever hurt you again.

> I'm not a monster I love you what ever happened that night it's not me . . . I don't remember . . . I promise I can make everything better.

> What ever happened that night its something that I don't even freaking remember . . . When I woke up I didn't know anything that happened the night before that's why I went and answered the door . . . because I didn't know what was going on[.]

> I ate them freaking gummy bears crap and drank to [sic] much liquor[.]

> [P]lease take a chance and text me back it can make everything better for both of us I'm sorry that I been taking all my anger out on you.

(State's exhibit Nos. 33, 34, 36, 46, 48, and 59-61.)

{¶ 11} Vega-Medina testified in his own defense. He admitted to being unfaithful to M.E. and that he spent the evening at his other girlfriend's house before coming home to M.E.'s house. Vega-Medina stated that he became angry with M.E. because he saw her on her phone, but she denied texting anyone. He explained that he "got mad and that's when I went to hit her face." (Tr. 416.) Vega-Medina admitted that he beat M.E. with a broom when she refused to unlock her phone and that he continued to beat her with a belt after the broom broke. (Tr. 416-417.) Vega-Medina further admitted that he eventually broke M.E.'s phone because she refused to unlock it and he suspected that she was texting another man. (Tr. 418-419, 422, 431, and 435.)

{¶ 12} Vega-Medina admitted that he had consumed alcohol and "one of those gummies" and that he did not remember everything that happened. (Tr.432, 437-438.) But he remembered he did not have a knife, he did not try to suffocate M.E. with a pillow, and he never barricaded the bedroom door with the mattress and box springs. Although he did not remember everything, he said he was remembering what happened "little by little." (Tr. 438-439.)

{¶ 13} The jury found Vega-Medina guilty of the kidnapping charge alleged in Count 1, the abduction charges alleged in Counts 2 and 3, the domestic-violence charge alleged in Count 7, the assault charge alleged in Count 8, and the menacing charge alleged in Count 9. The jury acquitted him of the felonious-assault charge alleged in Count 5 and the disrupting-public-services charge alleged in Count 6.

{¶ 14} At sentencing, Vega-Medina pleaded guilty to charges in a second case, Cuyahoga C.P. No. CR-22-673639-A. He pleaded guilty to one count of burglary in violation of R.C. 2911.12(A)(3), one count of menacing by stalking in violation of R.C. 2903.211, and one count of domestic violence in violation of R.C. 2919.25.

{¶ 15} The State argued at sentencing that Vega-Medina's conduct, as demonstrated by the two criminal cases before the court, "show[s] he has a clear disregard for other people's well-being." (Tr. 561.) After hearing a description of the events giving rise to CR-22-673639-A and a victim-impact statement from M.E., the court found that the kidnapping and abduction charges merged for sentencing purposes and the State elected to proceed to sentencing on the kidnapping conviction. The court also merged the assault, domestic violence, and menacing charges, and the State elected to proceed to sentencing on the domestic-violence conviction.

{¶ 16} On the kidnapping conviction, the court sentenced Vega-Medina to a minimum of five years and a maximum of seven years and six months in prison. The court also imposed a minimum of two years and up to a maximum of five years of postrelease control. On the domestic-violence conviction, the court sentenced Vega-Medina to time served. After imposing sentences, the court designated Vega-Medina a violent offender under R.C. 2903.41 and advised him of his registration requirements.

{¶ 17} In CR-22-673639-A, the court sentenced Vega-Medina to 36 months on the burglary charge, plus one year of mandatory postrelease control and up to three years of postrelease control. The court also sentenced Vega-Medina to 18 months on the menacing-by-stalking conviction and time served on the domestic-violence conviction in that case. Vega-Medina now appeals the trial court's judgment.

## II. Law and Analysis

### A. Manifest Weight

{¶ 18} In the first assignment of error, Vega-Medina argues his kidnapping and abduction convictions are against the manifest weight of the evidence.

{¶ 19} In a manifest-weight challenge, the reviewing court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "A conviction should be reversed as against the manifest weight of the evidence only in the most 'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Burks*, 2018-Ohio-4777, ¶ 47 (8th Dist.), quoting *Thompkins* at 388.

{¶ 20} Vega-Medina was convicted of one count of kidnapping in violation of R.C. 2905.01(A)(3) and two counts of abduction in violation of R.C. 2905.02(A)(1)

and (A)(2). R.C. 2905.01(A)(3), which governs kidnapping, states that "[n]o person, by force, threat, or deception, . . . shall remove another from the place where the other person is found or restrain the liberty of the other person, . . . [in order to] [t]o terrorize, or to inflict serious physical harm on the victim or another[.]"

{¶ 21} R.C. 2905.02(A)(1) and (2), which govern abduction, state that "[n]o person, without privilege to do so, shall knowingly . . .(1) [b]y force or threat, remove another from the place where the other person is found; [or] (2) [b]y force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear[.]"

{¶ 22} Vega-Medina argues the Cleveland Police Department failed to adequately investigate M.E.'s accusations against him because they never went to M.E.'s house where the alleged offenses occurred to search for evidence. He asserts that if the police had completed a proper investigation, they would have found no evidence that he barricaded the bedroom nor would they have found a steak knife in the bedroom as claimed by the victim, M.E. However, allegations of inadequate police investigations have no bearing on whether Vega-Medina's convictions are against the manifest weight of the evidence. *State v. Williams*, 2024-Ohio-838, ¶ 47 (8th Dist.), citing *State v. Johnson*, 2019-Ohio-5335, ¶ 11 (8th Dist.). In *Williams*, we explained that a manifest-weight challenge involves the credibility of the evidence presented at trial and that evidence that was not presented is not relevant to the analysis regardless of the reason for its absence. We, therefore, focus on the

credibility of the evidence presented in support of Vega-Medina's convictions and give no weight to the absence of evidence.

{¶ 23} Vega-Medina argues the evidence presented in support of his convictions are against the manifest weight of the evidence because M.E. testified that she went upstairs with him "willingly." Vega-Medina implies that because the victim went "willingly," she was not forced, threatened, or deceived as required by the kidnapping and abduction statutes.

{¶ 24} R.C. 2901.01 defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." However, the term "threat" is not defined. "A term not defined by statute is accorded its common, everyday meaning." *State v. Krupa*, 2010-Ohio-6268, ¶ 32 (7th Dist.), citing *State v. Dorso*, 4 Ohio St.3d 60, 62 (1983). The word "threat" is commonly defined, among other things, as "an expression of intention to inflict evil, injury, or damage." *Merriam-Webster Online*, https://www.merriam-webster.com/ dictionary /threat (accessed June 24, 2024). The Ohio Supreme Court has also held that the term "threat" represents "a range of statements or conduct intended to impart a feeling of apprehension in the victim, whether of bodily harm, property destruction, or lawful harm, such as exposing the victim's own misconduct." *State v. Cress*, 2006-Ohio-6501, ¶ 39.

{¶ 25} Nothing in either the kidnapping statute (R.C. 2905.01(A)(3)) or the abduction statute (R.C. 2905.02(A)(1) or (2)) requires the threat of force to be direct or explicit. Courts have held, in rape cases, that because the rape statute does not

require explicit threats of force, threats of force may be implied by the circumstances. *State v. Rupp*, 2007-Ohio-1561, ¶ 32, (7th Dist.). We apply the same reasoning here and conclude that because the kidnapping and abduction statutes do not expressly require an explicit threat, threats of force may be implied.

{¶ 26} M.E. testified that she went upstairs "willingly" because she was afraid of "what he was going to do." (Tr. 320.) M.E. explained that she complied because she "was scared" and she "was fearing for her life." (Tr. 320.) M.E. also testified that Vega-Medina ordered her to go upstairs after he beat her with a broom and a belt. There was, therefore, evidence of actual force. An ordinary reasonable person would infer under these circumstances that M.E. did not object to or resist Vega-Medina's order to go upstairs because she feared he would again use force to cause her additional harm. Therefore, M.E.'s testimony that she willingly complied with Vega-Medina's order does not negate the fact that there was competent, credible evidence of both force and a threat of force.

{¶ 27} Vega-Medina further contends the inconsistencies between M.E.'s statements to police and her testimony at trial rendered her testimony less than credible. However, the inconsistencies he cites, such as whether M.E. was awake when Vega-Medina came home and whether there were allegations of infidelity between Vega-Medina and M.E., do not involve facts material to the charged acts. However, M.E. unequivocally stated that Vega-Medina threatened to paralyze her with a knife if she attempted to call for help, that he threatened to kill her and her mother, that he barricaded M.E. in the room, and that he attempted to suffocate her

with a pillow. M.E. also testified that Vega-Medina destroyed her phone so she could not call for help. The minor inconsistencies in M.E.'s testimony do not render the rest of her testimony unreliable. Even if the jury did not believe those portions of M.E.'s testimony that were inconsistent with her statements to police, her remaining testimony is enough to sustain Vega-Medina's convictions.

{¶ 28} Vega-Medina nevertheless asserts that his testimony and text messages show that M.E. was not restrained because the doors were unlocked and she could have left the house. There was also evidence M.E. could have escaped out a window while he was sleeping because the bedroom was on the ground level. However, M.E. testified that Vega-Medina closed the windows and barricaded the door to the bedroom with the mattress and box springs. Although he fell asleep, M.E. was afraid Vega-Medina would kill her if he caught her trying to escape. Officer Donovan's body-camera video showed that M.E. was crying hysterically hours after the beating incident. This evidence corroborates M.E.'s testimony that the fear caused by Vega-Medina's conduct prevented her from escaping.

{¶ 29} Finally, Vega-Medina argues there is no evidence that he terrorized M.E. because he denied attempting to suffocate her with a pillow. However, as previously stated, M.E. testified that Vega-Medina not only attempted to suffocate her, he also threatened to kill her and her mother and threatened to paralyze her with a knife. The fact that she did not describe how Vega-Medina came into possession of the knife does not diminish the veracity of her testimony.

{¶ 30} M.E.'s testimony contained some minor inconsistencies, but it was remarkably consistent with respect to the material facts. Vega-Medina, himself, admitted that he hit M.E. several times with a broom and a belt. He also admitted that he consumed a gummy and alcohol and that these substances impaired his memory. Yet, despite admitting that his memory was impaired, Vega-Medina asserted he knew for a fact that he did not attempt to suffocate M.E. with a pillow, never barricaded the bedroom door, and never threatened M.E. with a knife. When Vega-Medina's testimony is considered together with all the evidence including his own admissions, it is clear that his testimony was self-serving and lacked credibility. Moreover, M.E.'s statements to police that were captured on Officer Donovan's body-camera video corroborate her testimony that she feared for her life. Therefore, this is not the rare case where the evidence weighs heavily against the conviction.

{¶ 31} The first assignment of error is overruled.

## B. Ineffective Assistance of Counsel

{¶ 32} In the second assignment of error, Vega-Medina claims his Sixth Amendment right to the effective assistance of counsel was violated. He argues his trial counsel was ineffective because (1) he failed to properly cross-examine witnesses in order to impeach M.E. regarding her prior inconsistent statements to police, and (2) he failed to properly question him on direct examination.

{¶ 33} To establish ineffective assistance of counsel, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonable representation and that he or she was prejudiced by that deficient

performance. *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

{¶ 34} Vega-Medina first argues that his trial counsel failed to properly cross-examine Detective William A. Cunningham ("Det. Cunningham"), the detective assigned to investigate the case. Vega-Medina asserts that "[d]uring cross-examination of Det. Cunningham, defense counsel attempted to ask whether the Complainant told him she was asleep when [Vega-Medina] came home." (Appellant's brief at 18-19.) He asserts that, based on the court's statements and counsel's intent to impeach M.E., "it is apparent the court would have allowed this impeachment if done properly during the Complainant's testimony." (Appellant's brief p. 19.) He concludes that "there is a reasonable probability that the impeachment of the Complainant would have affected the outcome of the trial." *Id.*

{¶ 35} Questioning M.E. about her inconsistent statements as to whether she was awake or asleep when Vega-Medina entered the home would relate to her credibility, but such impeachment would not have been enough to change the outcome of the trial. As previously stated, whether M.E. was asleep or awake is completely irrelevant to the charged conduct. Even if the jury chose not to believe the victim's trial testimony that she was awake, they could still believe her testimony that Vega-Medina beat her with a broom and belt and restrained her in a bedroom against her will.

{¶ 36} Vega-Medina himself admitted that he beat her and the body-camera video shows that M.E. was still frightened by Vega-Medina's actions when the police arrived. The body-camera video lends credence to M.E.'s testimony that Vega-Medina terrorized her by attempting to suffocate her with a pillow, barricading M.E. in the bedroom, and destroying M.E.'s phone so she could not call for help. Therefore, it is not likely that the outcome of the trial would have been different even if counsel had been able to properly impeach M.E.

{¶ 37} Vega-Medina further asserts that his trial counsel was ineffective because he failed to elicit testimony from him regarding the layout of the house. He implies that had he been properly questioned, the evidence would have established that it was impossible for Vega-Medina to block the doorway. He, therefore, concludes he would have been acquitted of the kidnapping and abduction charges.

{¶ 38} On direct examination, the State asked M.E. to sketch a layout of the house for the jury. Defense counsel questioned M.E. about the layout on cross-examination and used the sketch during the direct examination of Vega-Medina. Based on the testimony and exhibits, it was clear to the jury that M.E.'s home was a ranch and that it would be possible for someone to escape through a first-floor window. There was also evidence that M.E. might have escaped while Vega-Medina was sleeping. However, the evidence showed that M.E. was unable to escape because she was paralyzed by fear as a result of Vega-Medina's conduct. Thus, even if counsel had been able to establish that M.E. could have walked out the door, it

would not have changed the outcome of the trial. Therefore, Vega-Medina cannot establish a claim for ineffective assistance of counsel.

{¶ 39} The second assignment of error is overruled.

### C. Violent-Offender Designation

{¶ 40} In the third assignment of error, Vega-Medina argues the trial court's judgment designating him a violent offender was improper because the court failed to inform him of the violent-offender database requirements as required by R.C. 2903.42. The state concedes this error.

{¶ 41} R.C. 2903.42(A)(1) governs the violent-offender database and provides, in relevant part:

> For each person who is classified a violent offender, it is presumed that the violent offender shall be required to enroll in the violent offender database with respect to the offense that so classifies the person and shall have all violent offender database duties with respect to that offense for ten years after the offender initially enrolls in the database.

{¶ 42} R.C. 2903.42(C) provides, in its entirety:

> The judge, official, or official's designee providing the notice under division (A) (3), (A) (4), or (B) of this section shall require the violent offender to read and sign a form stating that the violent offender has received and understands the notice. If the violent offender is unable to read, the judge, official, or official's designee shall inform the violent offender of the violent offender's duties as set forth in the notice and shall certify on the form that the judge, official, or official's designee informed the violent offender of the violent offender's duties and that the violent offender indicated an understanding of those duties.

{¶ 43} Vega-Medina argues he did not understand the violent-offender duties and he never signed the violent-offender form. The State maintains that although Vega-Medina had an interpreter for the trial, he actually understands

English well because he has lived in the United States for 35 years and pleaded guilty to numerous counts in several other cases without an interpreter. Nevertheless, R.C. 2903.42(A)(1)(a) requires the court to inform the offender of the database duties *before* sentencing. Yet, the trial court informed Vega-Medina of his rights and duties under the violent-offender database *after* imposing the sentence and thereby violated the procedure outlined in R.C. 2903.42(A)(1)(a). We, therefore, sustain the third assignment of error, vacate Vega-Medina's sentence, and remand the case to the trial court to comply with the requirements of R.C. 2903.42(C). *See State v. Wooden*, 2022-Ohio-814, ¶ 29 (8th Dist.) (vacating sentence and remanding for resentencing where trial court failed to comply with R.C. 2903.42(C)).

### D. Sentence

{¶ 44} In the fourth assignment of error, Vega-Medina argues his sentence is contrary to law. He contends his sentence violates the purposes and principles of sentencing outlined in R.C. 2929.11.

{¶ 45} We review felony sentences under the standard of review set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 2016-Ohio-1002, ¶ 22-23. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or otherwise modify a sentence or vacate a sentence and remand for resentencing if it "clearly and convincingly" finds that (1) the record does not support certain of the sentencing court's findings or (2) the sentence is "otherwise contrary to law."

{¶ 46} "A sentence is contrary to law if (1) the sentence falls outside the statutory range for the particular degree of offense, or (2) the trial court failed to

consider the purposes and principles of sentencing set forth in R.C. 2929.11 and the sentencing factors set forth in R.C. 2929.12." *State v. Evans*, 2021-Ohio-3679, ¶ 12 (8th Dist.).

{¶ 47} As relevant here, R.C. 2929.11 provides that the purposes and principles of felony sentence are

> to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those purposes without imposing unnecessary burden on state or local government resources.

R.C. 2929.11 does not require a trial court to make any specific factual findings on the record. *State v. Jones*, 2020-Ohio-6729, ¶ 20, citing *State v. Wilson,* 2011-Ohio-2669, ¶ 31; *State v. Arnett*, 88 Ohio St.3d 208, 215, (2000). "[A] trial court's statement in its sentencing entry that it considered the required statutory factors is sufficient to fulfill a trial court's obligations under R.C. 2929.11 and 2929.12." *State v. Carter*, 2016-Ohio-2725, ¶ 16 (8th Dist.). Furthermore, "[n]othing in R.C. 2953.08(G)(2) permits an appellate court to independently weigh the evidence in the record and substitute its judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *Jones* at ¶ 42.

{¶ 48} It is undisputed that Vega-Medina's sentences fall within the applicable statutory range for each conviction. Vega-Medina contends the trial court violated R.C. 2929.11 by sentencing him to more than a minimum prison term required to adequately punish him and rehabilitate him. He maintains that a term

of community-control sanctions or a minimum prison term would have achieved the goals of R.C. 2929.11. He also argues the trial court failed to make any findings relative to R.C. 2929.11 at the sentencing hearing.

{¶ 49} R.C. 2929.13(D)(1) states that with respect to first- and second-degree felonies, "it is presumed that a prison term is necessary in order to comply with the purposes and principles of sentencing under section 2929.11 of the Revised Code." Vega-Medina's kidnapping conviction is a first-degree felony and is, therefore, presumed to carry a prison term.

{¶ 50} In arguing for a minimum sentence at trial, Vega-Medina's trial counsel informed the court that Vega-Medina was grieving the loss of his son who was murdered two and one-half years before the incident giving rise to this case. He also explained that Vega-Medina does not use marijuana and that Vega-Medina was enrolled in anger-management treatment. However, the court heard evidence at trial that Vega-Medina beat M.E. and destroyed her phone to prevent her from calling for help. He attempted to smother her with a pillow and threated to kill her and her mother. The court also noted that it considered Vega-Medina's criminal record, which involved numerous prior convictions including a case of violence against another woman. These findings are supported by the record, and the court indicated in the sentencing entry that it considered all factors required by law and that "prison is consistent with the purpose of R.C. 2929.11." Thus, the trial court complied with R.C. 2929.11. Therefore, Vega-Medina's sentence is not contrary to law.

{¶ 51} The fourth assignment of error is overruled.

{¶ 52} The trial court's judgment is affirmed in part and vacated in part. We affirm Vega-Medina's convictions but vacate his sentence and remand the case to the trial court to comply with the requirements of R.C. 2903.42(C).

{¶ 53} It is ordered that appellee and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

EILEEN T. GALLAGHER, JUDGE

MICHELLE J. SHEEHAN, P.J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR