[Cite as *In re A.H.*, 2025-Ohio-2220.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

IN RE A.H.                                          :

                                                                    No. 114216

A Minor Child                                    :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 26, 2025

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-24100751

*Appearances:*

David S. Bartos, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Alyssa Waite, Assistant Prosecuting
Attorney, *for appellee*.

LISA B. FORBES, J.:

{¶ 1} A.H. appeals the trial court's journal entry adjudicating her delinquent for, among other offenses, two counts of rape. For the following reasons, we affirm the juvenile court's decision.

## I. Procedural History

{¶ 2} On January 26, 2024, the Cuyahoga County Prosecutor's Office filed an eight-count delinquency complaint against A.H. Count 1 alleged that A.H. was

delinquent of rape — digital penetration, a felony of the first degree, in violation of R.C. 2907.02(A)(2). Count 2 alleged rape — vaginal penetration, a felony of the first degree, in violation of R.C. 2907.02(A)(2). Count 3 alleged kidnapping, a felony of the first degree, in violation of R.C. 2905.01(A)(4). Counts 4, 5, and 6 alleged illegal use of minor or impaired person in nudity-oriented material or performance, a felony of the second degree, in violation of R.C. 2907.323(A)(1). Count 7 alleged assault, a misdemeanor of the first degree, in violation of R.C. 2903.13(A). Count 8 alleged coercion, a misdemeanor of the second degree, in violation of R.C. 2905.12(A)(3).

## II. Trial

{¶ 3} On May 21, 2024, this case proceeded to a bench trial. The parties elicited the following testimony.

### A. Z.J.

{¶ 4} Alleged victim ("Z.J.") testified that she and A.H. were in an on-and-off romantic relationship that lasted three years. Both girls were 16 years old at the time of these events. Per Z.J., she and A.H. broke up in August or September and "never got back together."

{¶ 5} On September 22, 2023, Z.J. received a text message from A.H. telling her to get her things from A.H.'s house. Z.J. went to A.H.'s house. A.H. wanted to discuss their breakup. A.H. then viewed text messages on Z.J.'s phone in which Z.J. was "talking to other people." Per Z.J., "[t]hat's when it got physical." Z.J. testified

that A.H. hit her on her "face, my chest, my neck . . . ." Eventually, Z.J. returned to her own home.

{¶ 6} On September 23, 2023, Z.J. received "blackmailing messages" from A.H. These messages threatened to "leak" explicit photos of Z.J. Z.J. again went to A.H.'s house. Z.J. "felt like [she] didn't have any other option" and thought that if she visited A.H., the photos "wouldn't have gotten out."

{¶ 7} After Z.J. arrived at A.H.'s house, a "pocketknife had got pulled out." Z.J. testified, "I was forced to undress and [A.H.] took pictures of me and basically told me that she would post it on the internet and send them to whoever was in my phone." Z.J. also testified that A.H. "would like point" the pocketknife towards her and "threaten [her] with it." Z.J. was also "hit like basically the whole time being there." Z.J. then "sat on the bed and undressed" because she was "scared." A.H. then photographed Z.J. several times, during which Z.J. was "[c]rying." Several of the photos A.H. took were "live" photos, which are brief videos that are stored as a stationary image. Z.J. identified the sound of her own crying in the audio of these "live" photos.

{¶ 8} Per Z.J., A.H. gave Z.J. "an ultimatum if like I didn't have sex with her, that she would kill me." Per Z.J., A.H. "forced herself on me" "to have sex with me." Z.J. stated that A.H. used a dildo and her fingers. When Z.J. was asked where on her body, A.H. used the dildo and her fingers, Z.J. responded, "Vagina." Z.J. stated that she did not consent or agree to a sexual encounter with A.H.

{¶ 9} Z.J. then left A.H.'s house and called her mother, who came to meet her. Z.J. and her mother called the Shaker Heights Police Department to report the incident. Z.J. then went to University Hospital, where she "took a rape kit." Z.J. also testified that her "neck was bruised" from A.H. grabbing it.

{¶ 10} While at the hospital, Z.J. took and sent A.H. a photo of herself, which she captioned, "I just told them I hit my head." A.H. replied, denying doing anything to Z.J.'s head, to which Z.J. replied, "You did. When you pushed me into that corner . . . my head been killing me ever since."

{¶ 11} A.H. and Z.J. conversed by phone on September 24, 2023, and September 25, 2023.

{¶ 12} A.H. messaged Z.J. on Instagram, stating "there's nothing you could say or do so that I don't post this s**t and send it to your mom . . . ." Using Instagram, A.H. posted several of the explicit photographs she had taken of Z.J.

{¶ 13} A.H. later sent Z.J. "an apology." A.H. messaged Z.J., "I never ever want to come and hassle you ever again. I regret it now and I'm sorry I can't say enough. Come see me. I won't hurt you and I regret it now."

{¶ 14} On cross-examination, Z.J. stated that her mother did not know she continued to message A.H. during her hospital visit.

**B. Z.J.'s Mother**

{¶ 15} Z.J.'s Mother ("Mother") testified that Z.J. lived with her. Mother stated that Z.J. called her repeatedly between 3:00 p.m. and 8:00 p.m. on September 23, 2023, while Mother was at work. When Mother answered, Z.J. told

Mother that she had been raped. Mother stated that Z.J. was "distraught" and "crying, sobbing, like her words she could barely get them out." Mother left work and met Z.J. on a street between their shared home and A.H.'s home. Mother then called the police, who sent patrol officers to her and Z.J.'s location to take a statement. During the 9-1-1 call, Z.J. told Mother that A.H. was the person who raped her. Mother observed scratches on Z.J.'s body. Mother then took Z.J. to the hospital, where she was examined. Mother testified that since the alleged rape, Z.J. was less interested in school and that her grades declined. Per Mother, Z.J. was also less upbeat.

{¶ 16} On cross-examination, Mother admitted she was not present for Z.J.'s physical examination at the hospital. Z.J. was "uncomfortable," so "she was with the nurse alone." Mother also admitted that she had not wanted Z.J. to date A.H. prior to the alleged rape. Per Mother, "They were on and off a lot . . . ." Mother also stated, "There had been a lot of altercation between them." Mother "was afraid that it was gonna progress."

### C. Reshma Gheevarghese

{¶ 17} Reshma Gheevarghese ("Gheevarghese") testified that she is employed at the Cuyahoga County Regional Forensic Science Laboratory as a DNA analyst. Gheevarghese tested a rape kit, including swabs collected from Z.J., a dildo found in A.H.'s bedroom, and a swab from A.H. Gheevarghese also created a report of her findings. The results of her DNA testing indicated A.H.'s DNA was present on Z.J.'s mons pubis, abdomen, and neck. Gheevarghese's DNA testing further

indicated that Z.J.'s DNA was present on the shaft of the dildo and that both girls' DNA was present on its base.

{¶ 18} On cross-examination, Gheevarghese testified that there are multiple factors that can cause DNA evidence to degrade, although she can detect degradation while processing evidence, and that she did not test for seminal fluid because she understood that the alleged rape in this case involved two females.

**D. Kurt Falke**

{¶ 19} Kurt Falke ("Det. Falke") testified that he is a detective for the Shaker Heights Police Department. He interviewed Z.J. on September 25, 2023. He also searched A.H.'s home. During this search, he took photographs and collected A.H.'s phone, a purple dildo he found in A.H.'s bedroom, and a pocketknife he found in the kitchen of the home. The pocketknife was not tested for DNA. Det. Falke testified that the gray and white checked bedsheets he observed and photographed on A.H.'s bed during the search matched the bedsheets that Z.J. was laying on in at least one of the explicit photos uploaded to A.H.'s Instagram.

**E. Angella McMahan**

{¶ 20} Angella McMahan ("McMahan") testified that she works at University Hospital as a sexual assault nurse examiner and that she examined Z.J. on September 24, 2023. Per McMahan, she "could not pull out the edges of the hymen because [Z.J.] could not tolerate that"; McMahan testified that Z.J. "said it was very painful and tender." McMahan observed and photographed abrasions on Z.J.'s vagina, face, and neck. McMahan also administered a rape kit, which involved

swabbing several locations on Z.J.'s body, including her mouth and genitals, for DNA.

{¶ 21} On cross-examination, McMahan admitted she could not tell what caused the abrasions she observed on Z.J.'s body or whether any sexual encounter that might have caused them was consensual.

**F. A.H.**

{¶ 22} A.H. testified that she and Z.J. had an "ongoing relationship" that lasted several years, but that they had broken up "too many times to be able to count." A.H. testified that, at one point, Z.J. and her friends spray painted "Cheater" on A.H.'s house and threw barbecue sauce, toilet paper, and eggs at the house. A.H. testified that she had been "talking to another girl," and in September, A.H. and Z.J. broke up.

{¶ 23} On September 22, 2023, A.H. and Z.J. "got into an argument" but A.H. did not "remember what it was about . . . ." A.H. stated Z.J. came over to her house on September 23, 2023. A.H. expected Z.J. was coming over for the purpose of "intercourse" or "to chill, to hang out." Later, "we got into an argument" about something A.H. could not remember. Z.J. left, but she and A.H. continued to communicate by phone.

{¶ 24} Z.J. messaged A.H. that she was in the hospital, but A.H. was "confused on what she was in the hospital for." After that, A.H. stated, "everything was regular . . . between me and her" and that the relationship continued until

December, 2023. Z.J. continued "wanting to do stuff" with A.H. and "approach[ed] to have sex first . . . " even after the alleged rape.

{¶ 25} On cross-examination, A.H. denied any violent altercation occurred with Z.J. on September 23, 2023, denied that she blocked Z.J. from leaving A.H.'s bedroom, and denied pointing a knife at Z.J. A.H. stated, "[S]he knows I want to be in the military. I play around with those . . . and she knows it, with the pocketknives." A.H. denied having sex with Z.J. on September 23, 2023, and stated that they "only had finger penetration." A.H. denied that Z.J. was crying, but stated that she heard "whimpering" in the audio of the "live" she took of Z.J. A.H. denied her messages about hurting Z.J. referred to any violence that occurred on September 22, 2023, or September 23, 2023. A.H. stated the messages "are not specific about which incident" and that she did not know which "incident I'm talking about in there, so many have happened."

### III. After Trial

{¶ 26} On May 22, 2024, the court found A.H. delinquent on all counts. On June 27, 2024, the court held a dispositional hearing.

{¶ 27} On July 1, 2024, the court issued a journal entry committing A.H. to the legal custody of the Department of Youth Services. On Count 1, the court committed A.H. for an indefinite term consisting of a minimum period of one year and a maximum period not to exceed A.H.'s attainment of 21 years of age. The journal entry stated this term of commitment was consecutive to sentences for Counts 2 through 8. On each of Counts 2 and 3, the court imposed an indefinite

term of commitment consisting of a minimum period of one year and a maximum period not to exceed A.H.'s attainment of 21 years of age. The entry does not state explicitly whether these terms are to be served concurrently or consecutively to one another and to all other Counts. However, the consecutive-sentence order on Count 1 imposes a "total commitment of three (3) years at the Ohio Department of Youth Services." The entry also states the terms of commitment for Counts 4-8 are to be served concurrently to each other and to all other Counts. The court then stayed all commitments, required A.H. to register as a Tier I sex offender, and placed A.H. on community control for a period of one year.

{¶ 28} A.H. appeals, raising the following assignments of error:

1. The court errored [sic] by holding A.H. delinquent on the 2 charges of rape when the charges were not proven by a sufficiency or weight of the evidence to prove rape beyond a reasonable doubt.

2. The court committed plain error by concluding that certain counts of the complaints' sentences should be consecutive and failed to make specific findings under R.C. 2929.41.

**IV. Law and Analysis**

### A. Assignment of Error No. 1 — Sufficiency of the Evidence and Manifest Weight of the Evidence

{¶ 29} In her first assignment of error, A.H. asserts that the record contained insufficient evidence to support the court finding her delinquent for rape. A.H. also asserts the court's finding her delinquent for rape was against the manifest weight of the evidence. We disagree.

{¶ 30} Although the terms "sufficiency and "weight" of the evidence are "quantitatively and qualitatively different," we will address these issues together,

while applying distinct standards of review, because they are closely related. *See State v. Perry*, 2018-Ohio-487, ¶ 10 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 31} "A claim of insufficient evidence raises the question whether the evidence is legally sufficient to support the verdict as a matter of law." *State v. Parker*, 2022-Ohio-1237, ¶ 7 (8th Dist.), citing *Thompkins* at 386. "The relevant inquiry [in a sufficiency challenge] is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime existed beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 32} When making a sufficiency determination, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supports the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *Thompkins* at 386. Under a sufficiency challenge, witness credibility is immaterial.

{¶ 33} In contrast to sufficiency, a manifest-weight-of-the-evidence challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.). Weight of the evidence "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386-387. When considering an appellant's claim that a conviction is against the manifest weight of

the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of . . . conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Furthermore, in *State v. Jordan*, 2023-Ohio-3800, ¶ 17, quoting *Thompkins* at 387, the Ohio Supreme Court held that "[s]itting as the 'thirteenth juror,' the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion."

{¶ 34} In a manifest-weight challenge, the appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility, and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Reversal on manifest-weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *id.*

### 1. Sufficiency

{¶ 35} The record contains sufficient evidence to support finding A.H. delinquent for Count 1, first-degree rape — digital penetration and Count 2, first-degree rape — vaginal penetration. Both Counts 1 and 2 allege violations of R.C. 2907.02(A)(2), which states, "No person shall engage in sexual conduct with

another when the offender purposely compels the other person to submit by force or threat of force."

### a. Sexual Conduct

{¶ 36} The record contains sufficient evidence that on September 23, 2023, A.H. engaged in sexual conduct with Z.J., using both her fingers and a dildo. "Sexual conduct" is defined as "without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus or other object into the vaginal or anal opening of another." R.C. 2907.01(A). "[E]vidence of slight penetration, entering the vulva or labia, is sufficient to support a rape conviction." *State v. Baldwin*, 2024-Ohio-6177, ¶ 7 (8th Dist.). A.H. admitted that she engaged in "finger penetration" of Z.J. Z.J. testified that A.H. used "[a] dildo" that was "black and blue on her vagina." Det. Falke described finding a dildo of similar color — purple — in A.H.'s bedroom, where the alleged rape occurred. DNA testing indicated that Z.J.'s DNA was present on the shaft of the dildo and that both girls' DNA was present on its base. In addition, per Gheevarghese, A.H.'s DNA was also present on Z.J.'s mons pubis.

### b. Compelled to Submit Using Force or Threat of Force

{¶ 37} There is also sufficient evidence that A.H. compelled Z.J. to submit to sexual conduct using force or threat of force. R.C. 2901.01 defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." The Ohio Supreme Court has held that the term "threat" represents "a range of statements or conduct intended to impart a feeling of

apprehension in the victim, whether of bodily harm, property destruction, or lawful harm, such as exposing the victim's own misconduct." *State v. Cress*, 2006-Ohio-6501, ¶ 39. "Courts have held, in rape cases, that because the rape statute does not require explicit threats of force, threats of force may be implied by the circumstances." *State v. Vega-Medina,* 2024-Ohio-3409, ¶ 25 (8th Dist.), citing *State v. Rupp*, 2007-Ohio-1561, ¶ 32 (7th Dist.).

{¶ 38} When asked during her direct examination whether she consented to or agreed to anything that happened to her on September 23, 2023, Z.J. stated, "No." Mother testified that Z.J. called her, crying, after leaving A.H.'s house to tell Mother that "she was raped." At trial, Z.J. identified the sound of her own crying in the audio of the "live" photos A.H. took of her. Z.J. testified that A.H. "would like point" a pocketknife towards her and "threaten [her] with it." Per Z.J., A.H. later gave "an ultimatum if like I didn't have sex with her, that she would kill me." Det. Falke later discovered a pocketknife in A.H.'s home. Per Z.J., she was also "hit like basically the whole time being there." McMahan, the nurse examiner, observed and photographed abrasions to Z.J.'s vagina, face, and neck.

### 2. Manifest Weight

{¶ 39} The manifest weight of the evidence also supports finding A.H. delinquent for two counts of rape. As noted, A.H. admitted to "finger penetration." Though A.H. stated she had no other form of sex with Z.J. on September 23, 2023, Z.J. testified that A.H. used a dildo in addition to her fingers. Again, Det. Falke found a dildo in A.H.'s bedroom of a color like that which Z.J. described. Per

Gheevarghese, the dildo had A.H.'s and Z.J.'s DNA on it. Z.J. testified that she did not consent to engage in sexual conduct with A.H. but was "scared" because A.H. threatened her with a knife. A.H. explained her use of the knife by stating, "Me and [Z.J.] all the time she knows I want to be in the military. I play around with those . . . and she knows it, with the pocketknives." No other evidence in the record indicates A.H. was merely "play[ing] around" with a knife or that doing so was related to a desire to be in the military.

{¶ 40} Per Z.J., A.H. took the pocketknife out because Z.J. "was disobedient" while A.H. photographed Z.J. naked. The photos, which A.H. posted to Instagram, were admitted into evidence. Per Z.J., the associated audio contains the sound of her own crying. The record also contains nurse examiner McMahan's testimony and photographs of injuries to Z.J.'s vagina, face, and neck, supporting Z.J.'s testimony that A.H. hit her to compel her to have sex.

{¶ 41} The factfinder was free to reject A.H.'s version of events, particularly where corroborating evidence was presented in support of Z.J.'s testimony. Ohio courts consistently hold that the factfinder is "in the best position to assess the credibility of the witnesses who testified at trial" and is free to believe all, part or none of each witness' testimony. *State v. Jones*, 2020-Ohio-3367, ¶ 85 (8th Dist.). At trial, the finder of fact is in the "best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining the credibility of a witness and his or her testimony." *State v. Sheline*, 2019-Ohio-528, ¶ 100 (8th Dist.). Based on the evidence offered in support of

finding A.H. delinquent for rape, we cannot say this is an exceptional case in which the factfinder lost its way.

{¶ 42} Accordingly, assignment of error No. 1 is overruled.

**B. Assignment of Error No. 2 — Imposition of Consecutive Sentences**

{¶ 43} A.H. asserts, in her second assignment of error, that the court committed plain error by imposing consecutive sentences. A.H. argues R.C. 2929.41(A) required the court to make specific findings to support imposing consecutive sentences, which the court failed to make. We disagree.

{¶ 44} A juvenile court imposing consecutive sentences is not required to make specific findings under R.C. 2929.41(A). *See In re J.T.*, 2017-Ohio-7723, ¶ 32 (8th Dist.) (R.C. 2152.17 did not deprive juvenile offenders of equal protection of the law under the Fourteenth Amendment to the United States Constitution or Ohio Const. art. I, § 2 by authorizing consecutive juvenile sentences without "requiring the juvenile courts to make the same required findings that adult courts are required to make when imposing consecutive terms of commitment.").

{¶ 45} Further, R.C. 2152.19(A)(8) states that if a child is adjudicated to be delinquent, the court may "[m]ake any further disposition that the court finds proper . . . ." In *In re Samkas*, 80 Ohio App.3d 240 (8th Dist. 1992), this court determined that same language, then contained in R.C. 2141.355(A)(10), allowed a juvenile court to impose consecutive juvenile sentences. The Ohio Supreme Court later reasoned that "this catchall provision" authorizes "a juvenile court . . . to impose consecutive terms of commitment upon a delinquent minor for separate delinquent

acts whether or not they arise from the same set of operative facts." *In re Caldwell*, 76 Ohio St.3d 156, 159-161 (1996). Consequently, the trial court did not err by ordering consecutive juvenile sentences without making R.C. 2929.41(A) findings.

{¶ 46} Accordingly, assignment of error No. 2 is overruled.

{¶ 47} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

EILEEN A. GALLAGHER, A.J., and
ANITA LASTER MAYS, J., CONCUR