[Cite as *State v. Pettiford*, 2024-Ohio-4447.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HIGHLAND COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 23CA16 |
| Plaintiff-Appellee, | : | |
| v. | : | <u>DECISION AND</u><br><u>JUDGMENT ENTRY</u> |
| GARY LEE PETTIFORD, | : | |
| Defendant-Appellant. | : | **RELEASED 9/3/2024** |

_____
<u>APPEARANCES</u>:

Christopher Pagan, Middletown, Ohio, for appellant.

Anneka P. Collins, Highland County Prosecutor, Adam J. King, Highland County Assistant Prosecutor, Hillsboro, Ohio, for appellee.
_____
Hess, J.

{¶1}   Gary Lee Pettiford appeals his conviction following a jury trial on 2 counts of rape of a child under the age of 13. Pettiford contends the trial court admitted unlawful evidence when it allowed: (1) the testimony of witnesses who were administered their oaths in the clerk's office instead of in the courtroom; (2) the testimony of a DNA scientist without eliciting that the opinion was made within a reasonable degree of scientific certainty; and (3) the testimony of other-acts evidence that Pettiford abused another juvenile. Pettiford concedes that his trial counsel did not object and therefore the plain error standard of review applies. He contends that even if these errors individually did not prejudice him, the cumulative error doctrine applies such that they collectively resulted in sufficient prejudice and require a new trial.

**{¶2}** Pettiford also challenges his sentence. He contends that the trial court failed to make sufficient consecutive sentencing findings at the sentencing hearing and that the record fails to support the imposition of consecutive sentences. He also contends that the trial court erred in imposing mandatory postrelease control.

**{¶3}** We overrule Pettiford's first assignment of error because there were no errors in the administration of oaths or the admission of evidence. However, we affirm Pettiford's second assignment of error and conclude that the trial court erred when it ordered Pettiford to serve the consecutive sentences because it did not make all the findings required by R.C. 2929.14(C)(4) at the sentencing hearing. Therefore, we clearly and convincingly find that the order of consecutive sentences is contrary to law, vacate Pettiford's sentence, and remand the case for the limited purpose of resentencing him. Because we remand for a new sentencing hearing, we need not address his remaining arguments supporting his second assignment of error that challenge other aspects of his sentence. We affirm the trial court's judgment in all other respects.

## I. FACTS AND PROCEDURAL HISTORY

**{¶4}** The Highland County grand jury indicted Pettiford on 2 counts of rape of a child under the age of 13 in violation of R.C. 2907.02(A)(1)(b), first-degree felonies. Pettiford entered a not guilty plea and the matter proceeded to trial.

**{¶5}** At trial, M.P., who was 12 years old at the time of the offenses, testified that she and the victim, A.M., were school friends that hung out together after school. She and A.M. went swimming and then to Pettiford's house after school. There were a few people on the front porch when they arrived, but the people left except for Pettiford. Inside the house in the living room, Pettiford gave M.P. and A.M. alcohol and THC gummies.

Pettiford turned music on, shut the blinds, and locked the door. Pettiford asked M.P. and A.M. to dance but M.P. refused and instead she "grabbed the whiskey and went to the kitchen." When M.P. returned to the living room she saw A.M. and Pettiford both standing naked in front of the T.V., with Pettiford behind A.M.  M.P. ran out the back door of Pettiford's house and found her brother, D.P., who was at L.'s house. M.P. testified that she left so quickly that she ran out without her shoes and left them underneath the side table in the living room.

{¶6}   D.P. testified that his sister M.P. came running into L.'s house and told him that Pettiford had touched her and that something wrong had happened to A.M. D.P. called his grandmother to come get M.P.

{¶7}   A.M. testified that she was 12 years old at the time of the offenses. She testified that she and M.P. were friends who hung out together after school. They went swimming and then went to Pettiford's house. Other people were there when they arrived, but they left and only Pettiford was there with them. A.M. testified that they all three sat down on the couch in the living room and were drinking alcohol. Pettiford turned on music and asked them to dance. A.M. danced while M.P. left to go to the bathroom. A.M. testified that Pettiford got up behind her and started touching her private parts. A.M. testified that she did not have clothes on but that she could not remember how her clothes were removed. Pettiford had on "a tee-shirt and jeans" and was rubbing his genitals on her. He unzipped his pants and began rubbing more of his genitals on her "privates." Then he moved A.M. to the couch where he had A.M. sit on his lap and he grabbed her chest. Pettiford then grabbed A.M. by the shoulders and stuck his penis in her mouth. Pettiford

also put his finger inside her vagina. A.M. testified that she was menstruating at the time. Pettiford touched and kissed her after he put his finger inside her vagina.

{¶8} The next thing A.M. could remember was a "really loud knock." Pettiford got up, tried to wipe the blood off his hands, and went to the door with his pants still around his ankles. A.M. saw law enforcement come in as she was trying to get dressed. A.M. testified that law enforcement took her to the police car and the next thing she can recall is "waking up realizing that I was in a hospital."

{¶9} A sexual assault nurse examiner employed by Adena Medical Center testified that she examined A.M. who told her that Pettiford forced his penis into her mouth and inserted his finger into her vagina. The nurse testified that A.M. told her she was menstruating, and that Pettiford had inserted his finger into her vagina and then touched her neck and was kissing her neck. The nurse witnessed red fingerprint marks from the blood located on A.M.'s neck.

{¶10} Patrolman Daniel Rogers with the Greenfield Police Department testified that he received a call from M.P. who stated that she had been touched and that her friend was being raped by a person named "Bub." Patrolman Rogers did not know who "Bub" was, but he was working with Sergeant Beatty who knew it referred to Gary Pettiford. Rogers testified that he and Beatty went to Pettiford's residence and handcuffed Pettiford and moved A.M. to his patrol car. He observed A.M. visibly upset, crying and shaking and "seemed like she had just put on her underwear." He called for an ambulance and had A.M. taken away for treatment.

{¶11} Sergeant Jay Beatty with the Greenfield Police Department testified that he had received a call from M.P. who had reported that she had been "touched or molested

by Bub." She also advised Beatty that her friend was actively being raped by Bub at the time of the call. Beatty testified that "Bub" was Gary Pettiford. When Beatty and Rogers arrived at Pettiford's house, Rogers went around to the back door in the event anyone tried to escape. Beatty heard loud music from inside the house and observed alcoholic beverages scattered around the front porch. Because of the loud music Beatty knocked loudly and announced, "police, come to the door at this time." After he knocked, Pettiford came to the front door and completely removed the blinds from the glass portion of the door so that Beatty could see him clearly. "I observed his pants down to his ankles and his penis was out." Beatty also observed a young female running from the living room to the kitchen "and this female had no clothes on from the waist down and whatever her covering was . . . pulled up exposing her breasts." Beatty and Pettiford struggled at the door with Pettiford attempting to keep Beatty out. Beatty eventually succeeded in getting Pettiford in handcuffs. Beatty spoke briefly with A.M. and determined that she was not okay. Beatty obtained a search warrant and retrieved clothing from the victim and her friend M.P. from Pettiford's home. He also retrieved the underwear Pettiford was wearing that evening.

{¶12} The jury found Pettiford guilty of both counts. The trial court sentenced Pettiford to a prison term of 10 years to life on each count to be served consecutively for a total prison term of 20 years to life. The trial court also advised Pettiford that upon completion of the sentence if he were to be released on parole, he would be supervised under parole, but that he must also be supervised for at least five years under postrelease control supervision.

## II.  ASSIGNMENTS OF ERROR

**{¶13}** Pettiford presents the following assignments of error:

I.      The trial court admitted unlawful evidence.

II.     The trial court imposed an unlawful sentence.

## III.  LAW AND ANALYSIS

### A.  The Evidence Admitted at Trial

**{¶14}** Pettiford raises three issues concerning the evidence presented at trial. First, he contends that the trial court erred when it permitted the witnesses to be administered their oaths in the clerk's office instead of in the courtroom in front of the jury. He argues that this meant that the jury did not have evidence about who gave the oaths, the oath-giver's qualifications, the words that comprised the oaths, and the witnesses' conduct concerning their oaths. Second, he contends that the DNA scientist failed to state that her opinions were made within a reasonable degree of scientific certainty and therefore were inadmissible under Evid.R. 702(C). Third, he contends that the State presented other-acts evidence that he had abused another juvenile without filing a pretrial Evid.R. 404(B) motion and the trial court failed to weigh whether that evidence was more prejudicial than probative and gave no limiting instructions. He argues that even if any one of these errors individually did not cause prejudice, taken cumulatively they resulted in sufficient prejudice and violated his constitutional right to a fair trial.

**{¶15}** Pettiford concedes that his trial counsel failed to object to any of these purported errors and has forfeited all but plain error review.

### 1.  Plain Error Standard of Review

{¶16} An appellate court " 'will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.' " *State v. Awan*, 22 Ohio St. 3d 120, 122 (1986), quoting *State v. Childs*, 14 Ohio St.2d 56 (1968), paragraph three of the syllabus. Appellate courts may, however, consider a forfeited argument using a plain-error analysis. *State v. Shields*, 2023-Ohio-2331, ¶ 72 (4th Dist.). Crim.R. 52(B) states: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." It is the defendant's burden to "establish that an error occurred, it was obvious, and it affected his or her substantial rights." *State v. Fannon*, 2018-Ohio-5242, ¶ 21 (4th Dist.) "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶17} Evidentiary rulings generally rest within a trial court's sound discretion. *State v. Crotts,* 2004-Ohio-6550, ¶ 25.

> "A trial court has broad discretion to determine whether to exclude evidence under Evid.R. 403(A), and ' "an appellate court should not interfere absent a clear abuse of that discretion." ' " "[A]n abuse of discretion implies that a court's attitude is unreasonable, arbitrary, or unconscionable." (Citations omitted.)

*State v. Rowland,* 2024-Ohio-1660, ¶ 61 (4th Dist.).

### 2. Oath of Witnesses

{¶18} Pettiford argues that every witness was administered the oath in the clerk's office outside of the courtroom and therefore the jury did not have "any evidence about

the oath – including who gave it, their qualifications, the words that comprised it, and the juveniles' conduct around it."

**{¶19}** Evid.R. 603 governs oaths and affirmations of witnesses and provides, "Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so." Additionally, the legislature has mandated that "[b]efore testifying, a witness shall be sworn to testify the truth, the whole truth, and nothing but the truth." R.C. 2317.30. The oath or affirmation is a prerequisite to the testimony of a witness and a trial court errs by relying on unsworn testimony in reaching its decision. *Allstate Ins. Co. v. Rule*, 64 Ohio St.2d 67, 69 (1980) (holding that relying upon unsworn testimony violates the Ohio Constitution and is error). If a party fails to timely object to the missing oath, all but plain error is waived. *Stores Realty Co. v. City of Cleveland, Bd. of Bldg. Stds. And Bldg. Appeals*, 41 Ohio St.2d 41, 43 (1975); *In re E.C.*, 2015-Ohio-4807, ¶ 6 (3d Dist.).

**{¶20}** Here the witnesses were each administered their oath in the clerk's office. Prior to each of the witness's testimony, the trial court asked, "Were you sworn in at the Clerk's Office?" and each witness answered affirmatively.

**{¶21}** Pettiford cites no Ohio case law to support his argument that the oath must be administered by the trial judge in the courtroom in front of the jury. The only Ohio case he cites involved a bench trial and the complete failure to administer any oath to any of the witnesses. *Wasaleski v. Jasinski*, 2015-Ohio-2307 (9th Dist.). In *Wasaleski,* the parties were representing themselves in small claims court over a loan dispute involving $3,000. The magistrate questioned the parties but failed to swear them in before doing

so. The appellate court determined that the trial court had relied on the unsworn testimony in rendering judgment in favor of Wasaleski. The appellate court held that the trial court committed plain error in considering and relying on the unsworn statements of the parties. *Id.* at ¶ 7. *Wasaleski* is distinguishable because here the witnesses were all sworn in prior to testifying.

**{¶22}** Pettiford cites a dissenting opinion in a federal Ninth Circuit case for legal support of his argument that the "irregular" swearing in of witnesses is a structural error that deprives the defendant of his right to confrontation. *See United States v. Armijo*, 5 F.3d 1229, 1237 (9th Cir.1993), dissenting opinion. However, we do not find the analysis of the federal court's dissenting opinion persuasive. In *Armijo*, an interpreter had translated a recorded telephone conversation carried out in Spanish and was administered an oath by which she swore that her translation of the phone call was made to the best of her ability. The majority noted that in its prior case law, the court held that the federal evidentiary rule concerning the swearing of interpreters applies only when they translate the testimony of witnesses on the stand. The majority also held that the type of oath administered by the court to this translator was proper and that there is no constitutional or statutorily required form of oath:

> [W]e held that Federal Rule of Evidence 604 applies only to interpreters who translate the testimony of witnesses on the stand and does not apply to language experts. In other situations, the standard oath for witnesses applies. Federal Rule of Evidence 603 provides that "every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so."
>
> In this case, the district court asked the translator to swear that she "translated the tape that is in issue here today from Spanish to English to the best of [her] ability." She did so and also later explained that as a court translator she is subject to a standing oath "so it doesn't have to be done

every time I appear in Court." Armijo nevertheless argues this was insufficient to satisfy the requirements of Rule 603 since the translator appeared as a witness and was subjected to direct and cross examination. Armijo did not make that argument to the district court and, accordingly, we review for plain error.

We conclude that there was no error, and certainly no plain error, in the court's failure to administer the more specific oath now advanced by Armijo. First, there is no constitutional or statutorily required form of oath. Second, the oath that was administered in our minds would have impressed upon the translator the importance of truthful and accurate translation. Her testimony and the direct and cross examination that followed merely tested the accuracy and validity of her translation, not her credibility or veracity as a witness. There was no error. (Citations omitted.)

*Id.* at 1235.

**{¶23}** The *Armijo* dissent rejected this and determined that an oath must satisfy two requirements: (1) the importance of truth telling and (2) the punishment for perjury. The dissent believed that neither of the two requirements were satisfied:

We have stated that "any statement indicating that the [witness] is impressed with the duty to tell the truth and understands that he or she can be prosecuted for perjury for failure to do so satisfies the requirement for an oath or affirmation...." The oath formulated by the district court and administered to Ms. Ahrens, however, satisfied neither of these requirements. The district court merely asked Ms. Ahrens: "Do you swear that you *have translated* the tape that is in issue here today from Spanish to English to the best of your ability so help you God?" (emphasis added). The court did not remind Ms. Ahrens of her duty to tell the truth *while on the stand*, nor did it inform her that she would face imprisonment if she testified falsely. (Citations omitted.) (Emphasis in original and "emphasis added" parenthetical in original.)

*Id.* at 1236.

**{¶24}** However, the dissent recognized that the position it was adopting conflicted with several other federal circuits, which found errors in the administration of oaths to be "irregularities" that are waived if not objected to:

Other circuits have labeled the failure to administer the standard witness oath an "irregularity" that is waived on appeal if not promptly objected to in

the trial court. *United States v. Odom,* 736 F.2d 104, 114 (4th Cir.1984) ("It is well settled that the swearing of a witness is waived by failure to raise the point during the witness' testimony, thus denying the trial court an opportunity to correct what has been characterized as an 'irregularity.' "); *see also United States v. Perez,* 651 F.2d 268, 273 (5th Cir.1981) ("It has long been the general rule that even a failure to swear a witness may be waived."); *Wilcoxon v. United States,* 231 F.2d 384, 387 (10th Cir.) (By failing to bring the lack of an oath to the attention of the court at the time the witness testified, the defendant waived the right to seek a new trial on that ground), cert. denied, 351 U.S. 943, 76 S.Ct. 834, 100 L.Ed. 1469 (1956); *Beausoliel v. United States,* 107 F.2d 292, 294 (D.C.Cir.1939) ( "[W]e are of the opinion that the irregular administration of the oath to a witness, or the taking of testimony without an oath at all, must, if known to the adverse party, be objected to at the time. [A defendant] may not, with knowledge of the irregularity, permit the trial to proceed, and raise the question after the verdict."). (Brackets in original.)

*Id.* at 1237.

**{¶25}** Pettiford has failed to provide any legal support which would establish that an error occurred in the administration of the oaths. He cites nothing in the record from which we could conclude that the administration of the oath in the clerk's office failed to accomplish the objectives of Evid.R. 603. We find no error, plain or otherwise, in the way the oaths were administered. Pettiford has failed to meet his burden of showing that plain error occurred in the administration of the oaths.

### 3.  The DNA Expert Testimony

**{¶26}** Pettiford contends that the DNA expert witness failed to state that her opinion was made within a reasonable degree of scientific certainty. Therefore, he argues that the testimony failed to comply with Evid. R. 702(C) and should have been excluded.

**{¶27}** Here the DNA expert testified that she was employed as a forensic scientist in the DNA unit of the Ohio Bureau of Criminal Investigation for 20 years, had extensive, specialized training, and had testified as an expert multiple times. The expert prepared a report of her DNA analysis which was admitted into evidence. She testified that she tested

the DNA found on Pettiford's underwear with the victim's DNA and found that the victim

was the major DNA profile on Pettiford's underwear:

> Q. In your expert opinion based on your testing, education and training and experience who was the major contributor of the DNA on State's Exhibit 3 [Pettiford's underwear]?
>
> A. The major contributor was consistent with A.M. [the victim].
>
> Q. And what was the person that was likely?
>
> A. The statistics that we generated is that the major DNA profile was rarer than one in one trillion unrelated individuals.
>
> Q. Do you know how many people are on Earth today?
>
> A. Yes, it's about 8.1 billion so one in one trillion is approximately a thousand times that.

**{¶28}** Here the expert testified that it was her expert opinion based on her testing, education, training, and experience that the victim was the major contributor of the DNA on Pettiford's underwear and that such match to anyone else would be rarer than one in one trillion unrelated individuals. Her written report showed that the DNA in Pettiford's underwear was consistent with the victim's DNA, with a statistical ratio of being rarer than one in one trillion unrelated individuals (i.e., the forensic scientist would have to test more than a trillion other persons who were not related to the victim to find someone also matching that DNA profile).

**{¶29}** We reject Pettiford's argument that the expert witness must state that her opinion was made within a reasonable degree of scientific certainty. *See State v. Fannon,* 2018-Ohio-5242, ¶ 110-116 (4th Dist.). In *Fannon,* the defendants, like Pettiford here, argued that the testimony of the treating physicians who were also qualified to testify as expert witnesses in pediatric radiology and child abuse/pediatrics, did not give their

medical opinions "in terms of possibility or probability" and did not advance their opinions

to the "reasonable degree of medical certainty" under Evid.R. 702. Therefore, they

contended that the doctors' findings and interpretations "were improper" because the

foundational requirements of Evid.R. 702(C) were not present. We rejected this argument

as contrary to well-established precedent:

> In *State v. D'Ambrosio*, 67 Ohio St.3d 185, 191, 1993-Ohio-170, 616 N.E.2d 909, the court held that expert witnesses in criminal cases can testify in terms of possibility rather than in terms of a reasonable scientific certainty or probability. In *D'Ambrosio*, the medical expert testified that it was "physically possible" that all the wounds could have been made by the same knife. The defendant argued that the testimony should have been excluded because it was not stated in terms of "a reasonable medical certainty or probability." The Court held that the testimony was admissible:

>> While several decisions from this court indicate that speculative opinions by medical experts are inadmissible since they are based on possibilities and not probabilities, see*, e.g., Shumaker v. Oliver B. Cannon & Sons, Inc*. (1986), 28 Ohio St.3d 367, 28 OBR 429, 504 N.E.2d 44, we believe that the better practice, especially in criminal cases, is to let experts testify in terms of possibility. See Giannelli, Ohio Evidence Manual (1988) 98, Section 702.05, and Jacobs, Ohio Evidence (1989) 168, Section 702–03.

> *Id.* at 191, 1993-Ohio-170, 616 N.E.2d 909. "Questions about the certainty of the scientific results are matters of weight for the jury." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶¶ 73-77 (2011) citing *State v. Allen*, 5th Dist. No. 2009-CA-13, 2010-Ohio-4644, 2010 WL 3784818, ¶ 157.

*Fannon* at ¶ 112.

**{¶30}** We further rejected the argument that an expert must use specific phrases

to characterize their findings, such as the phrase Pettiford suggests here that the findings

must be "within a reasonable degree of scientific certainty."

> More importantly, "a set of magic words" is not necessary*. See State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 162 ("under Evid.R. 702, experts are not required to use any particular 'magic

words.' * * * an expert's opinion is admissible so long as it provides evidence of more than mere possibility or speculation'").

*Id.* at ¶ 114.

**{¶31}** We reject Pettiford's argument that the DNA expert's findings and interpretations were inadmissible under Evid.R. 702(C) because she did not use the magic words "within a reasonable degree of scientific certainty" when giving her findings. Pettiford has failed to meet his burden of showing that plain error occurred in the admission of this expert testimony. Moreover, considering the overwhelming evidence of Pettiford's guilt, any errors in the admission of this expert testimony would have had no effect on the outcome of this trial.

### 4.  The Other-Acts Evidence

**{¶32}** Pettiford contends that the State elicited other-acts evidence in two instances. He argues that the other-acts evidence was presented by the testimony of D.P. and Sargeant Beatty. In both instances the witnesses were testifying about what M.P. had said to them about the incident at Pettiford's house. M.P. had been present while the criminal acts Pettiford perpetrated against the victim, A.M., had occurred.  D.P. testified that his sister M.P. kept repeating that Pettiford had touched her and that something wrong happened to A.M.

> A. Yes, [M.P.] had came to the door and was talking to [L.'s] mom and [L.'s] mom had called for me to tell me that somebody was here for me and then by that point I was trying to put on my shoes and to go outside and [M.P.] had actually came through [L.'s] bedroom door stumbling, just having a hard time breathing and trying to talk to me and she just kept falling over, so I got her outside.
>
> Q. When you got her outside what did she tell you?
>
> A. Uh, she just kept repeating like three different statements, she said that Gary had touched her and that something wrong had happened to [A.M.].

D.P. testified that upon hearing his sister's statements he borrowed L.'s phone and called their grandmother to come to get her.

**{¶33}** Sergeant Beatty testified that he received a call from M.P. who reported that she was touched or molested by Pettiford and that her friend was being actively raped by him at that time:

Q. And just briefly what did she report?

A. [M.P.] reported to me that she was touched or molested by Bub. She also advised me that her friend, [A.M.], was actively being raped by Bub at that time.

Sergeant Beatty testified that he went to speak to M.P. in person and she was "extremely distraught. . . . she was crying, hysterical." Sergeant Beatty also testified that Gary Pettiford was known to him as "Bub."

**{¶34}** All relevant evidence is admissible unless otherwise excluded by law. Evid.R. 402. Under Evid.R. 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Although relevant, evidence must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). The evidence that M.P. stated that Pettiford had touched her prior to raping A.M. is relevant evidence.

**{¶35}** The State argues that none of this testimony concerns "other-acts evidence." We agree. The testimony by D.P. and Sargeant Beatty about what M.P. reported to them related directly to the events at issue in the case and provided a background chronology. Evidence Rule 404(B) governs the use of "other-acts evidence"

and applies to evidence of other crimes, wrongs or acts extrinsic to the charged offense and not those acts that are intrinsic to the offense. Under Evid.R. 404(B)(1), "[e]vidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

**{¶36}**   Other acts evidence may not be used to establish a person's propensity to engage in certain conduct. However, they may be properly admitted "as 'inextricably intertwined' with an offense" or for one of the "legitimate purpose[s]" set forth in Evid.R. 404(B)(2). *State v. Hill*, 2019-Ohio-3432, ¶ 49 (5th Dist.) (evidence of text messages from a different purported drug sale were not "other-acts evidence" and were admissible when they were sent on the same day as the transaction at issue). Evid.R. 404(B) only applies to limit the admission of other acts evidence that is "extrinsic" to the crime charged. *State v. Stallworth*, 2014-Ohio-4297, ¶ 37 (11th Dist.) (evidence of defendant's assault of his girlfriend earlier in the evening was not "other-acts evidence" but was inextricably intertwined with the crimes charged, which included defendant's assault of another individual later in the evening). Evid. R. 404(B) does not apply when the acts are intrinsic – part of the events in question or form part of the immediate background of the alleged act which forms the basis for the crime charged. *State v. Wainscott*, 2016-Ohio-1153, ¶ 19 (12th Dist.). "When other acts are 'inextricably intertwined' with [an] offense, those acts are said to be intrinsic to the alleged crime." *Stallworth* at ¶ 38, quoting *United States v. Siegel*, 536 F.3d 306, 316 (4th Cir. 2008).

**{¶37}**   "Other acts 'are inextricably intertwined with a charged crime when they are so blended or connected with the charged crime that proof of one incidentally involves the other, explains the circumstances thereof, or tends logically to prove any element of

the crime charged.' " *State v. Crowley,* 2023-Ohio-1764, ¶ 21 (2nd Dist.), quoting *State v. Sinclair*, 2003-Ohio-3246, ¶ 35 (2nd Dist.). "Stated differently, . . . 'other acts' evidence is inextricably intertwined with charged conduct when testimony about the other acts is 'necessary to give the complete picture of what occurred.' " *Sinclair* at ¶ 35, quoting *State v. Wilkinson*, 64 Ohio St.2d 308, 318 (1980). "Consequently, a court can admit evidence of other acts which form the immediate background of and which are inextricably related to an act which forms the foundation of the charged offense." *State v. York*, 2022-Ohio-1626, ¶ 57 (3d Dist.) quoting *State v. Ash*, 2018-Ohio-1139, ¶ 60 (7th Dist.); *State v. Smith*, 2023-Ohio-3015, ¶ 56-58 (3d Dist.).

**{¶38}** We find that the testimony D.P. and Sergeant Beatty gave that M.P. had stated that Pettiford had touched or molested her, which were made under extreme distress and while M.P. was reporting an ongoing rape were not "other-acts evidence" because they were not extrinsic to the acts which formed the foundation of the offenses charged, but rather explained the circumstances thereof and was blended and connected to them. Moreover, a trial court has discretion in weighing the probative value against the unfair prejudice when admitting relevant evidence. Absent an abuse of discretion resulting in material prejudice to the defendant, "a reviewing court should be reluctant to interfere with a trial court's decision in this regard." *State v. Hill*, 2019-Ohio-3432, ¶ 46 (5th Dist.). Pettiford has failed to meet his burden of showing that plain error occurred in the admission of this evidence.

### 5. Cumulative Error

**{¶39}** Under the cumulative-error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to

a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995), citing *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus; *State v. Ruble,* 2017-Ohio-7259, ¶ 75 (4th Dist.). "Before we consider whether 'cumulative errors' are present, we must first find that the trial court committed multiple errors*." State v. Smith*, 2016-Ohio-5062, ¶ 106 (4th Dist.), citing *State v. Harrington,* 2006-Ohio-4388, ¶ 57 (4th Dist.).

**{¶40}** The cumulative error doctrine does not apply where the defendant "cannot point to 'multiple instances of harmless error.' " *State v. Mammone*, 2014-Ohio-1942, ¶ 148 ("And to the extent that Mammone more broadly invokes the doctrine of cumulative error, that doctrine does not apply because he cannot point to 'multiple instances of harmless error.' "); *State v. Colonel*, 2023-Ohio-3945, ¶ 64-66 (4th Dist.); *State v. Fannon,* 2018-Ohio-5242, ¶ 124-125 (4th Dist.).

**{¶41}** Pettiford argues that cumulative evidentiary errors violated his constitutional right to a fair trial. However, because we found no errors, the cumulative error doctrine does not apply. *Mammone* at ¶ 173; *State v. Maxwell*, 2014-Ohio-1019, ¶ 253 (doctrine of cumulative error is not applicable where there are not numerous instances of trial-court error and defendant was not prejudiced by any error at the trial or penalty phase of the proceedings); *Colonel* at ¶ 66 (cumulative error doctrine does not apply where there are no errors).

**{¶42}** Having found no merit to the evidentiary challenges Pettiford presents, we overrule his first assignment of error.

B.  Sentencing

{¶43} For his second assignment of error, Pettiford contends that the trial court imposed an unlawful sentence. First, he contends the trial court failed to make sufficient findings required by R.C. 2929.14(C)(4) to support the consecutive sentences imposed at the sentencing hearing. Pettiford concedes the trial court made the findings in the sentencing entry. Second, Pettiford argues that the trial court's consecutive-sentencing findings made in the sentencing entry are clearly and convincingly not supported by the record. Last, Pettiford contends that the postrelease control sanction was contrary to law because the rape offense carried a life sentence so parole, not postrelease control, applied to his sentence.

### 1. Imposition of Consecutive Sentences

{¶44} Under R.C. 2953.08(A)(4) "a defendant who is convicted of or pleads guilty to a felony may appeal as a matter of right the sentence imposed upon the defendant" on the ground that "[t]he sentence is contrary to law." "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under [R.C. 2953.08] or may vacate the sentence and remand the matter to the sentencing court for resentencing" "if it clearly and convincingly finds" that the record does not support certain findings by the sentencing court, including consecutive sentence findings under R.C. 2929.14(C)(4), or "[t]hat the sentence is otherwise contrary to law." R.C. 2953.08(G)(2).

{¶45} R.C. 2929.14(C)(4) states:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶46} "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry . . . ." *State v. Bonnell*, 2014-Ohio-3177, ¶ 37. "Though 'a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, . . . it has no obligation to state reasons to support its findings. Nor is it required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry.' " *State v. Jones,* 2024-Ohio-1083, ¶ 11, quoting *Bonnell* at ¶ 37. "R.C. 2953.08(F) requires an appellate court to review the entire trial-court record, including any oral or written statements made to or by the trial court at the sentencing hearing, and any presentence, psychiatric, or other investigative report that was submitted to the court in writing before the sentence was imposed." *Jones* at ¶ 12, citing R.C. 2953.08(F)(1) through (4). "If the trial court fails to make the requisite findings at the sentencing hearing, the imposition of consecutive sentences is contrary to law even if the sentencing entry includes the

findings." *State v. Conn*, 2023-Ohio-2669, ¶ 26 (4th Dist.); *State v. Nolan*, 2024-Ohio-1245, ¶ 18 (4th Dist.).

**{¶47}** The trial court sentenced Pettiford to a minimum mandatory prison term of 10 years to life on each of the 2 rape counts and ordered that they be served consecutively. The trial court's sentencing remarks, including those findings required under R.C. 2929.14(C)(4), were made as follows at the sentencing hearing:

> It's the order of the Court, Mr. Pettiford, that you be and you are hereby sentenced on count 1 to a term of minimum mandatory term of 10 years up to and including life as may be determined by the Adult Parole Authority. As to count 2 you're sentenced to the same sentence of 10 years as a minimum mandatory up to life as a maximum according to the Adult Parole Authority. I know that you are 71 years old, the purpose of the Court's sentence in this case is to protect the public, and so in order to do that because of the nature of these offenses and differing courses of conduct and the nature of the criminal conduct here it's the order of the Court that those be served consecutively to each other for a total of 20 years to life.

**{¶48}** The sentencing entry contains the following findings concerning consecutive sentences:

> Pursuant to Section 2929.14(C)(4) that the consecutive sentences are necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and the court also finds any of the following:
>
> At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶49}** The trial court's sentencing entry satisfies the R.C. 2929.14(C)(4) requirements. However, we are unable to discern that the trial court's oral

pronouncements at the sentencing hearing satisfied the pertinent requirements. The trial court stated it was sentencing Pettiford to consecutive sentences "to protect the public . . . because of the nature of the offenses" and from this we discern that the trial court was considering the need to protect the public from future offenses. However, we cannot discern that the trial court made the requisite proportionality finding. Although the court stated it considered the "differing courses of conduct and the nature of the criminal conduct," there was nothing in the court's remarks that discussed the proportionality of the sentence to either the seriousness of Pettiford's conduct or the danger he poses to the public. There was also no discussion of Pettiford's criminal history, or the great and unusual harm caused by the offenses from which we can discern that the court made findings under R.C. 2929.14(C)(4)(b) or (c), as reflected in the court's sentencing entry.

{¶50} The trial court erred when it imposed consecutive sentences here. Because the trial court failed to make all the requisite findings under R.C. 2929.14(C)(4) at the sentencing hearing, we clearly and convincingly find that the order of consecutive sentences is contrary to law. *Conn* at ¶ 29. Accordingly, we sustain the second assignment of error, vacate Pettiford's sentence and remand the case for the limited purpose of resentencing him. *Id.*

{¶51} However, "[w]e hasten to add . . . that our decision should not be construed as a comment on the propriety of consecutive sentences. On remand, the trial court may choose to impose any sentence it deems appropriate under the pertinent statutory provisions." *State v. Brickles*, 2021-Ohio-178, ¶ 11 (4th Dist.).

**{¶52}** Because we sustain his second assignment of error and remand for a new sentencing hearing, we need not address his remaining arguments raised in his second assignment of error that challenge other aspects of his sentence. App.R. 12(A)(1)(c).

## IV. CONCLUSION

**{¶53}** For the foregoing reasons, we overrule the first assignment of error and sustain the second assignment of error. We affirm the trial court's judgment in part, vacate it in part, and remand for further proceedings consistent with this decision.

JUDGMENT AFFIRMED IN PART AND VACATED IN PART.

CAUSE REMANDED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED IN PART, VACATED IN PART, CAUSE REMANDED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Highland County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.

For the Court

BY: _____
     Michael D. Hess, Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**