[Cite as *State v. Lemaster*, 2025-Ohio-5621.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
MEIGS COUNTY

STATE OF OHIO,                          :
                                        :       Case No. 24CA6
    Plaintiff-Appellee,                  :
                                        :
v.                                      :
                                        :
JOSEPH LEMASTER,                        :       DECISION AND JUDGMENT
                                        :       ENTRY
    Defendant-Appellant.                 :       **RELEASED: 12/09/2025**
_____

APPEARANCES:

Kyle C. Henderson, Logan, Ohio, for appellant.

James K. Stanley, Meigs County Prosecuting Attorney, Pomeroy, Ohio, for appellee.
_____

Wilkin, J.

{¶1}   This is an appeal of a Meigs County Court of Common Pleas judgment entry in which Joseph Lemaster ("Lemaster") was convicted of abduction and misdemeanor assault.  On appeal Lemaster raises five assignments of error, contending that:  1) his convictions are against the manifest weight of evidence; 2) there was insufficient evidence to support the convictions; 3) he suffered prejudice when the prosecutor made improper comments during closing arguments; 4) he was denied due process because of a *Brady* violation; and 5) he received ineffective assistance of counsel during trial.  For the following reasons we find no merit to any of these assignments of error and affirm the trial court.

BACKGROUND

{¶2}   On October 11, 2023, a Meigs County grand jury returned a two-count indictment for an incident that occurred on July 9, 2023, alleging that Lemaster

committed two offenses in which S.S. was the victim:  Count 1, abduction, in violation of R.C. 2905.02(A)(2), a third-degree felony, and Count 2, assault, in violation of R.C. 2903.13(A), a first-degree misdemeanor.

{¶3}    The parties had motion practice and several pretrial hearings were held. In particular, on April 23, 2024, the State filed a Rule 404(B) notice indicating its intention to use other crimes, wrongs, or acts.  The specific testimony involved a phone call that Lemaster made during the course of the indicted conduct.  The State alleged that Lemaster called P.R., the victim of a previous offense ("P.R."), and told her that he was going to beat S.S. like he had beat her and then kill S.S.  According to the State's notice, this information had been provided in discovery to the defense on December 7, 2023.  The State contended the purpose of this testimony was to show Lemaster's intent, plan, knowledge, and lack of mistake or accident in the instant case.

{¶4}    Defense counsel filed an objection based on Evid.R. 401 (relevance); Evid.R. 404(B) (not offered for non-propensity purpose); and Evid.R. 403 (the probative value of the evidence was more prejudicial than probative).  Lemaster also requested an evidentiary hearing on the issue.

{¶5}    On June 18, 2024 (the same day of, but prior to, the jury trial), the trial court held a hearing in which the State called S.S. as a witness.  At that hearing, S.S. detailed a conversation that occurred during the indicted offenses.  According to S.S., Lemaster called P.R. on the speaker so S.S. could hear, and demanded P.R. tell S.S. what he did to her.  Further, Lemaster stated he would do the same to S.S.  Also, according to S.S., Lemaster threatened to kill her if P.R. didn't show up within 30 minutes.   During that phone call, P.R. said that Lemaster broke her collarbone and

busted out her eye socket to the extent that she had to go to physical therapy for a while.

{¶6}    After the defense's cross-examination of S.S., and the trial court's asking for further argument from the parties, the trial court found that the statements were permissible because they were statements made during the act itself.  The trial court also ruled that both Lemaster's and P.R.'s parts of the conversation could be admitted through S.S.' testimony.

{¶7}    The jury trial commenced that same day and lasted until June 19, 2024. The State called two witnesses:  Anthony Woods ("Woods"), Meigs County Sheriff's Deputy, and S.S.  The State also entered as exhibits photographs of S.S. from the incident and body cam footage showing the interior of the camper where most of the incident took place.  The defense called no witnesses but entered several exhibits.

{¶8}    Woods was the first to testify.  Woods explained that, after being notified by another deputy about a reported domestic matter, he spoke with S.S. and took S.S.'s written statement.  Woods also observed S.S. had a bitemark on her arm and a knot on her head.  Woods took pictures of these injuries.  After Woods took S.S.'s statement and pictures of the injuries, he took S.S. back to the location of the incident to retrieve her property at her request.  He and other law enforcement (Deputies Tre Wallace and Ben Adams) wanted to ensure S.S.'s safety while she retrieved her belongings.

{¶9}    During Woods' testimony, the State inquired, as follows:

PROSECUTOR:  And where exactly is this property?

WOODS:  On one twenty-four (124).  Uh, right out of Syracuse.

PROSECUTOR:  Okay.  Between Syracuse and Racine?

WOODS:  Yeah.  There's like a little . . . there's a trailer park, kind of.

PROSECUTOR:  Okay.

WOODS:  Camper park.

PROSECUTOR:  And that's where the camper was?

WOODS:  Right.

**{¶10}**  Woods testified also that S.S. retrieved her cell phone, a charger, and a few clothes when he took her to the camper.

**{¶11}**  On cross-examination, Woods testified about the extent of the investigation, and was asked by defense counsel about any differences in S.S.'s oral versus her written statements to Woods.  Defense counsel also asked several questions about the photographs and the extent of S.S.'s injuries.  In addition, defense counsel cross-examined about some omissions in Woods' report. The defense cross-examined Woods about the fact S.S. reported Lemaster would strike her "every few minutes" and also alleged the incident occurred from 11:00 p.m. to 1:30 a.m., such that she would have suffered multiple blows if her statement were literally true.  Further, the defense pointed out that the victim did not report the incident until over 14 hours later.

**{¶12}**  The defense also asked Woods whether he had noticed signs of a struggle in the camper, and Woods said if he had, he would have noted them in his report.  Further, the defense inquired as to why Woods did not call P.R. to ask her about the incident even though S.S.'s statement to police mentioned that Lemaster had called someone with P.R.'s first name during the incident.

**{¶13}**  On redirect, Woods clarified that S.S.'s statement said Lemaster "would get up angry every few minutes and hit me open-handed," and the statement also

included S.S.'s describing the incident by saying that Lemaster "blocked me from getting to the door to leave" which went on from about 11:00 p.m. to 1:30 a.m. Woods also explained that a part of the report did contain an allegation of physical harm, and the photographs documented that injury.

{¶14} S.S. testified next. According to S.S., Lemaster and she met on a dating app and had begun dating that June prior to the incident. S.S., who lived in Urbana (over two hours driving distance from Pomeroy), began to spend weekends at Lemaster's camper in Meigs County on Maple Wood Lane, after the two had gone on a few dates.

{¶15} According to S.S., the camper was located off Maple Wood Lane, in between Racine and Pomeroy. The State asked S.S. if the camper was located in Meigs County, and S.S. responded, "[a]s far as I understand, yes." S.S. also, however, went on to explain that she had never been to Meigs County before staying with Lemaster and did not know where the Syracuse or Racine police departments were.

{¶16} During direct examination, S.S. described a long day where she had gone with Lemaster to the state park and also visited Lemaster's family. The pair had not eaten all day and decided to get dinner rather late (around 9:30 or 10:00 p.m.) at Taco Bell. While in the drive-through at Taco Bell, Lemaster began getting upset and ranting about S.S. putting another man before him, saying S.S. needed to "watch her tone." After several words were exchanged, S.S., who was driving the vehicle, decided to take Lemaster back to the camper and she would return to her home in Urbana. But first, S.S. wished to retrieve her belongings.

**{¶17}** When the couple arrived at the camper, Lemaster went inside and she sat in the car. S.S. tried to decide whether she was going to get her things that still remained in the camper, which consisted of a bag of clothes and her purse. She had kept her wallet, keys, and phone in the car at that point.

**{¶18}** She decided she wanted to retrieve her personal items from the purse. So, she went to the door of the camper and tried to go inside, but the door was locked. After more words were exchanged, she asked Lemaster if he would hurt her if she went into the camper, and he said "no, I won't hurt you[,]" therefore, S.S. went inside.

**{¶19}** After S.S. went into the camper, Lemaster called P.R. on the phone so that S.S. could hear the conversation. Lemaster told P.R. to tell S.S. what would happen if S.S. put another man before him, and P.R. eventually responded that Lemaster broke her collarbone and busted out her eye socket. P.R. also said she had to go to physical therapy for some time. Also, according to S.S., Lemaster told P.R. that P.R. better get there, because if she didn't, he was going to "kill" S.S.

**{¶20}** At this point, S.S. was "shaking," and "really, really scared." Lemaster closed all the blinds, locked the front door, tossed S.S.'s cell phone away from her, and then backhanded S.S. across the face. S.S. then described several instances where Lemaster struck her while calling her degrading names. He hit her on the top of the head, and on the side, and she put her hands up to protect herself. He also "ripped her hair out," and told her to sit down if she tried to stand up.

**{¶21}** S.S. tried to call 911 on her watch but could not manage to do so. Lemaster also broke the face of S.S.'s watch when she was covering her face to protect herself. She said, "please just let me leave," and he said, "no, you're not fucking going

anywhere," then struck her again.  During the incident, he said he could rape her daughter, rape her mother, kill them both, and kill her father.  At some point he leaned in very slowly and kissed her on the lips, then spit in her face.  He said, "I don't want to hurt you," and "it wasn't that bad, was it?," and she replied "no," trying to keep calm, but in fact she really believed he was going to kill her.  And P.R. never showed up.

{¶22}  Finally, Lemaster said, "get out," and "you're not worth it."  She left, leaving her phone, charger, purse, and bag in the room.  She had her keys in her pocket and drove.  Because she was afraid he would follow her, she drove all the way home to Urbana and got back about 4:00 a.m.  She had not slept, so she needed some time to get her mind right and ended up telling her parents.  Then she drove back to Meigs County and reported the incident later that day.  S.S. testified that she was afraid to leave because he would kill her, he was in between her and the door the whole time, and he had thrown her cell phone, so she could not get to it during the incident.

{¶23}  During cross-examination, defense counsel tried to elicit testimony from S.S. that she exaggerated the number of blows, or that she could have left.  When asking S.S. about the photos she herself took for law enforcement, she first testified that she took photographs of her injuries before she went to the authorities, but then acknowledged she could not have, because her cell phone was at the camper.  S.S. later clarified she took the photos when she returned from retrieving the phone from the camper.

{¶24}  After hearing all evidence, the jury found Lemaster guilty of both offenses. The trial court then sentenced Lemaster to 36 months on Count 1, abduction, and 180 days as to Count 2, assault, finding that Count 2 merged with Count 1, and running the

sentences concurrent to one another.  The trial court notified Lemaster of mandatory

post-release control and advised him of his right to appeal.  Lemaster filed this timely

appeal, asserting five errors.

ASSIGNMENTS OF ERROR

I.     THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF APPELLANT'S RIGHT OF DUE PROCESS AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTION[S].

II.    THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT A CONVICTION OF APPELLANT IN VIOLATION OF HIS DUE PROCESS RIGHTS AS GUARANTEED BY THE OHIO CONSTITUTION AND THE UNITED STATES CONSTITUTION.

III.   APPELLANT SUFFERED PREJUDICE WHEN THE PROSECUTOR MADE MULTIPLE IMPROPER COMMENTS DURING CLOSING ARGUMENTS.

IV.    APPELLANT WAS DENIED DUE PROCESS RIGHTS GUARANTEED BY THE OHIO CONSTITUTION AND THE UNITED STATES CONSTITUTION DUE TO A BRADY VIOLATION.

V.     APPELLANT'S TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE OHIO CONSTITUTION AND THE UNITED STATES CONSTITUTION.

First and Second Assignments of Error

{¶25}  For ease of analysis, we address Lemaster's first and second

assignments of error in conjunction with one another.  In his first assignment of error,

Lemaster primarily challenges the manifest weight of the evidence because of S.S.'s

credibility.  He claims she did not exhibit injuries consistent with her statements of

abuse, gave conflicting stories about having the cell phone in her possession that night,

could not credibly testify about venue, and did not report the abuse until more than 14

hours later.  He also indicates the State failed to document what items S.S. removed

from the camper the next day.  In his second assignment of error, he limits the discussion to whether the State sufficiently proved venue for the offenses.

{¶26}  The State responds the jury's verdict was not against the manifest weight of the evidence, emphasizing the jury's role in assessing witness credibility and the sufficiency of the evidence, including the victim's testimony and circumstances. For the second assignment of error, the State argues it presented sufficient evidence to establish venue in Meigs County, by providing specific testimony of the location of the crime, as well as circumstantial evidence.  Further, the State directs us to a defense exhibit with what it asserts is the address of the incident.

## A.  Law

{¶27}  In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279 (1978), syllabus.

{¶28}  The weight and credibility of evidence are to be determined by the trier of fact. *State v. Kirkland*, 2014-Ohio-1966, ¶ 132. The trier of fact "is free to believe all, part or none of the testimony of any witness," and we "defer to the trier of fact on these

evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility." *State v. Dillard*, 2014-Ohio-4974, ¶ 28 (4th Dist.), citing *State v. West*, 2014-Ohio-1941, ¶ 23 (4th Dist.).

**{¶29}** In addition, "[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's witnesses." *State v. Chancey*, 2015-Ohio-5585, ¶ 36 (4th Dist.), citing *State v. Wilson*, 2014-Ohio-3182, ¶ 24 (9th Dist.), citing *State v. Martinez*, 2013-Ohio-3189, ¶ 16 (9th Dist.). Moreover, " '[w]hile the jury may take note of inconsistencies and resolve or discount them accordingly, * * * such inconsistences (sic.) do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' " *State v. Corson*, 2015-Ohio-5332, ¶ 31 (4th Dist.), quoting *State v. Proby*, 2015-Ohio-3364, ¶ 42 (10th Dist.), citing *State v. Gullick*, 2014-Ohio-1642, ¶ 10 (10th Dist.).

**{¶30}** "When an appellate court concludes that the weight of the evidence supports a defendant's conviction, this conclusion necessarily includes a finding that sufficient evidence supports the conviction." *State v. Wickersham*, 2015-Ohio-2756, ¶ 27 (4th Dist.), citing *State v. Pollitt,* 2010-Ohio-2556, ¶ 15 (4th Dist.). A determination that a conviction is not against the manifest weight of the evidence is therefore dispositive of the issue of whether the evidence is sufficient to sustain a conviction. *Id.*, citing *State v. Lombardi,* 2005-Ohio-4942, ¶ 9 (9th Dist.). Therefore, in the instant case, we consider Lemaster's argument that his convictions are against the manifest weight of the evidence.

B.   Analysis.

**{¶31}** Lemaster was charged with abduction and misdemeanor assault. As relevant to this case, abduction, R.C. 2905.02(A(2), provides: "[n]o person, without privilege to do so, shall knowingly * * * [b]y force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear[.]" Assault, R.C. 2903.13(A), provides: "[n]o person shall knowingly cause or attempt to cause physical harm to another or to another's unborn."

**{¶32}** The State presented the testimony of the victim describing the abduction and assault. *"Testimony alone is sufficient to support an appellant's criminal conviction." State v. Jarrells,* 2024-Ohio-2816, ¶ 33 (4th Dist.) In addition, Deputy Woods testified that he saw injuries on the victim, and documented the injuries with photographs, which were entered as exhibits.

**{¶33}** First, Lemaster argues that S.S. did not exhibit injuries consistent with her statements of abuse. Lemaster states that S.S. did not appear injured on the body cam video. At trial, the defense cross-examined Woods and S.S. about her claims that Lemaster would strike her "every few minutes" over a time period from 11:00 p.m. to 1:30 a.m. The defense's point was that if the defendant literally struck her that often, S.S. would have had suffered multiple blows and her injuries would have been more severe. However, the State elicited testimony from S.S. that oftentimes she would put up her arms to defend herself from the blows. Further, S.S. adequately explained what she meant by that statement.

**{¶34}** In addition, Lemaster was charged with misdemeanor assault, and not felonious assault, so the State only had to prove "physical harm." R.C. 2901.01(A)(3) defines "[p]hysical harm to persons" as "any injury, illness, or other physiological

impairment, regardless of its gravity or duration."  S.S. testified that she had a red mark to her face, bruising to her face, a knot on top of her head, as well as a bitemark on her arm.  Woods corroborated these facts.  These injuries are consistent with her testimony. In addition, as to the abduction count, the State only had to prove the risk of physical harm, but in fact showed that physical harm occurred.

{¶35}  The defense also points out that S.S. testified during direct examination that she had left the camper without her cell phone but instead returned the next day to retrieve it.  Woods also stated that S.S. did retrieve her cell phone the following afternoon; however, he did not document that fact.  On cross, however, S.S. stated that she left Lemaster's home and then went to Urbana without calling law enforcement but then called a friend to tell him about the incident. She also testified during cross-examination that the pictures she herself took of her injuries were taken once she returned to Urbana, but defense counsel succeeded in having S.S. admit that could not have been so if she had left her phone in the camper in Meigs County and retrieved it later in the afternoon with the assistance of law enforcement.  S.S. admitted that she may have been mistaken about when she took the pictures; however, it was not clear about how she was able to telephone her friend when she returned to Urbana if she did not have her phone.

{¶36}  Lemaster also argues that S.S. was not credible because she took over 14 hours to report the incident, despite her fear of Lemaster.  The failure to report an incident immediately does not necessarily render a person's testimony completely uncredible if the victim explains the delay in reporting the offense.  *See State v. Reed*, 2024-Ohio-1363, ¶¶ 15-16 (8th Dist.) (where a victim described that incident occurred

over several hours and was ultimately able to explain why she did not leave when she could have and why she did not report the events to the police immediately).  Here, there was ample evidence to explain why S.S., who explained she had been assaulted until 1:30 a.m. had first returned to her home in Urbana because she was unfamiliar with the Meigs County area, did not readily know where to report the crime late at night, and also feared that Lemaster would pursue her.

{¶37}  Overall, we would recognize that the trier of fact may accept or reject a witness' testimony in whole or in part."  *Reed* at ¶ 15, citing *State v. Grimes*, 2022-Ohio-4526, ¶ 53 (8th Dist.).  We emphasize that the witness' credibility is to be determined by the trier of fact. *State v. Kirkland*, 2014-Ohio-1966, ¶ 132.  We may not substitute our own judgment for that of the finder of fact when it comes to the choice between credible witnesses and their conflicting testimony.  *Reed* at ¶ 15, citing *State v. Williams,* 2019-Ohio-794, ¶ 28 (8th Dist.), citing *State v. Awan,* 22 Ohio St.3d 120, 123 (1986).

{¶38}  Lemaster additionally states that the State did not meet its burden because law enforcement failed to document any of the items S.S. removed from the scene, such as her cell phone, purse, or overnight bag.  The Eighth District considered a similar appellate challenge in an incident involving abduction and felonious assault, among other offenses.  *State v. Vega-Medina,* 2024-Ohio-3409, ¶ 22-23 (8th Dist.).  There, the defendant argued that the police department failed to adequately investigate the victims' allegations against him because officers never went to the home where the incident occurred to search for evidence.  *Id.*  Also, the defendant argued that had law enforcement gone to the residence they would have found no evidence corroborating the victim's testimony, including her statement that the defendant used a knife in the

commission of the offense. *Id.* The Eight District held "allegations of inadequate police investigations have no bearing on whether [the defendant's] convictions are against the manifest weight of evidence." *Id.* at ¶ 22. The focus of a manifest weight challenge is the credibility of the evidence presented in support of the convictions, not the absence of evidence. *Id.* In the case sub judice, we therefore find that the manifest weight of the evidence as to the elements of the offenses show that the jury did not clearly lose its way, as some competent and credible evidence supports the jury's verdict.

**{¶39}** But our review of the evidence does not stop there, as Lemaster urges us to determine whether the State sufficiently proved venue beyond a reasonable doubt. In addition to the elements of the offense, the State must present evidence of proper venue in order to sustain a conviction for an offense. *State v. Foreman*, 2021-Ohio-3409, ¶ 13, citing *State v. Hampton*, 2012-Ohio-5688 ¶ 20. "Ohio Constitution, Article I, Section 10, 'fixes venue or the proper place to try a criminal matter.' " *State v. Holloway,* 2024-Ohio-3189, ¶ 30 (8th Dist.), quoting *State v. Hampton,* 2012-Ohio-5688, ¶ 19. Although venue is not a material element of any criminal offense * * * it is a fact that must be proved at trial beyond a reasonable doubt, unless it has been waived by the defendant." *Foreman* at ¶ 13, citing *State v. Headley*, 6 Ohio St.3d 475, 477 (1983), citing *State v. Dickerson*, 77 Ohio St. 34, 82 N.E. 969 (1907), paragraph one of the syllabus. "The [S]tate need not prove venue 'in express terms,' provided that 'all the facts and circumstances in the case' establish it." *Id.* at ¶ 13, quoting *Headley* at 477, citing *Dickerson* at paragraph one of the syllabus.

**{¶40}** "A defendant has waived the right to challenge venue when it is raised for the first time on appeal." *Holloway* at ¶ 28, citing *State v. Coley*, 93 Ohio St.3d 253, 258

(2001), citing *State v. Campbell*, 90 Ohio St.3d 320, 336 (2000). "However, failure to prove venue is a defect affecting a substantial right and is subject to review under the plain error doctrine." *State v. Conrwell,* 2011-Ohio-1220, ¶ 5, citing *State v. Woodson* 1998 WL 51606, at * 3 (Feb. 11, 1998).

**{¶41}** For the first time on appeal, Lemaster argues that S.S.'s testimony regarding venue was insufficient. S.S. testified that the camper where the incident took place was located off Maplewood Lane, in between Racine and Pomeroy, Ohio. The State went on to ask S.S. specifically if the camper was located in Meigs County, and S.S. responded, "[a]s far as I understand, yes." "A victim's testimony about the location of the crimes is sufficient to establish proper venue." *State v. Thacker,* 2020-Ohio-4620, ¶ 39 (4th Dist.), citing *State v. Lancaster,* 2018-Ohio-315, ¶ 56 (2d Dist.). Should that have been the only evidence of venue, it may have been concerning because the State's closing arguments highlight the fact that S.S., who lived two and a half hours away, was pretty unfamiliar with the area. However, the State presented other circumstantial evidence to satisfy the proof of venue. The Supreme Court of Ohio has emphasized that circumstantial evidence can be used to establish venue. *State v. Sanders,* 2025-Ohio-1603, ¶ 22 (11th Dist.), citing *State v. Smith*, 2024-Ohio-5030, ¶ 2.

**{¶42}** In addition to S.S.'s testimony about the area where the incident occurred and her understanding of the county of residence, we would note that the officer investigating the case, Deputy Woods, was a Meigs County Sheriff's Deputy. Testimony regarding the jurisdiction of law enforcement can be circumstantial evidence of venue. *See State v. Thacker,* ¶ 38-39 (4th Dist.). Additionally, the State specifically asked Woods where the camper was located, and he stated that the camper was

located in a camper park right off of State Route 124, between Syracuse and Racine,

Ohio.

{¶43}  Further, Evid.R. 201(B)(1) provides that a court can take judicial notice of

a fact "(1) generally known within the territorial jurisdiction of the trial court or (2)

capable of accurate and ready determination by resort to sources whose accuracy

cannot reasonably be questioned."  Thus, "[a]n appellate court may take judicial notice

of its jurisdictional limits."  *State v. Burkhalter,* 2006-Ohio-1623, ¶ 17 (6th Dist.).

Accordingly, "[a]n appellate court has authority to take judicial notice regarding the

characteristics of the streets of the jurisdiction."  *State v. Bradford*, 2018-Ohio-1417, ¶

69 (8th Dist.), citing *State v. Thomas*, 1993 WL 9719, 3, fn. 2 (11th Dist. Jan. 8, 1993).

Additionally, courts of appeals have taken judicial notice of Google maps and satellite

image as a "source[ ] whose accuracy cannot reasonably be questioned."  *Id.*

{¶44}  As we previously explained:

> In taking judicial notice of a geographical fact, a court may rely upon sources
> like public documents and maps.  *State v. Elliott*, 4th Dist. Ross No.
> 06CA2924, 2007-Ohio-2178, 2007 WL 1323434, ¶ 14; see 31 Corpus Juris
> Secundum, Evidence, Section 12, at 733-735.  Many courts "take judicial
> notice of a Google map [or] satellite image as a 'source[ ] whose accuracy
> cannot reasonably be questioned[.]' " *Pahls v. Thomas*, 718 F.3d 1210,
> 1216 (10th Cir.2013), fn. 1, citing *United States v. Perea-Rey*, 680 F.3d
> 1179, 1182 (9th Cir.2012), fn. 1; see *State v. Bradford*, 2018-Ohio-1417,
> 101 N.E.3d 710, ¶ 69 (8th Dist.). However, some courts only use Google
> maps to take judicial notice of the "general location" of an event or
> geographical fact. See Pahls at 1216, fn. 1; Perea-Rey at 1182, fn. 1;
> Bradford at ¶ 74, fn. 6.

*State v. Isaac,* 2018-Ohio-5433, ¶ 13 (4th Dist.).

{¶45}  The State directs us to defense Exhibit E, the police report, which shows

the address of the incident is "30122 Lot 17 Maplewood Pk Ln, Racine, OH."  In a case

addressing a similar appellate challenge, we determined that the exact street address,

apartment number and name of the apartment complex where the crimes occurred were enough for the jury to determine the location of the offenses. *State v. Conrwell,* 2011-Ohio-1220, ¶ 9 (4th Dist.). *See also, State v. Lewis,* 2010-Ohio-130, ¶ 10 (4th Dist.) (testimony regarding the state route, mile marker and street name was actually more precise than explicitly stating the name of the county where the offense occurred). This is particularly true if the record contains evidence of the street address and the additional proof that a specific law enforcement department responded to the location of the offense. *State v. Sanders,* 2025-Ohio-1603, ¶ 24 (11th Dist.).

{¶46} Despite the exhibit showing what appears to be an exact location of the offense, we take judicial notice that Maplewood Pk Ln appears to be an invalid address. However, there exists a campground off State Route 124 in Racine, Ohio which is located near 30122 Maplewood *Lake Road*. In this case, even without considering the defense exhibit, we take judicial notice that the entire area of State Route 124 between Syracuse and Racine falls with Meigs County, Ohio, and further, that the entire village of Racine is in Meigs County. If a city spans more than one county, we would have reached a different result. *See State v. Marcum*, 2018-Ohio-1135, ¶ 19 (5th Dist.) (where appellate court observed that the City of Reynoldsburg spanned three different counties—Licking, Fairfield, and Franklin—such that recitation of an address in Reynoldsburg was insufficient to prove venue, resulting in plain error, and reversal of the conviction for lack of sufficient evidence.).

{¶47} We therefore find the evidence is not against the manifest weight and overrule Lemaster's first assignment of error. We also find that the record contains

sufficient evidence of venue beyond a reasonable doubt such that no plain error exists and therefore defendant's second assignment of error has no merit.

## Third Assignment of Error

{¶48} In his third assignment of error, Lemaster argues the trial court committed plain error when the prosecutor engaged in prosecutorial misconduct by making improper comments during closing arguments. According to Lemaster, the State shifted the burden of proof during closing argument by requiring him to disprove the hearsay statements of P.R. that included what he deems was other-acts evidence.

{¶49} The State in turn argues that it did not make improper comments during closing, but instead points out the comments were made during rebuttal in response to Lemaster's trial counsel's arguments. The State further opines that Lemaster has not shown prejudice in any event.

### A. Law

{¶50} " ' "The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial." ' " *State v. Smith,* 2024-Ohio-5168, ¶ 118 (4th Dist.), quoting *State v. Benge*, 2021-Ohio-152, ¶ 54 (4th Dist.), quoting *State v. Jackson,* 92 Ohio St.3d 436, 441 (2001). We therefore review a claim for prosecutorial misconduct by determining "whether the remarks were improper, and, if so, whether they prejudicially affected the accused's substantial rights." *State v. Garrett,* 2022-Ohio-4218, ¶ 144, citing *State v. Smith,* 14 Ohio St.3d 13,14 (1984). " 'To establish prejudice, a defendant must show that a reasonable probability exists that, but for the prosecutor's improper remarks, the result of the proceeding would have been different.' " *State v. Martin*, 2024-Ohio-2334, ¶ 80 (4th Dist.)*,* quoting *State v. Topping,*

2012-Ohio-5617, ¶ 83 (4th Dist.).  The "touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *Garrett* at ¶ 144, quoting *Smith v. Phillips,* 455 U.S. 209, 219 (1982). "The Constitution does not guarantee an 'error-free, perfect trial.' " *Martin* at ¶ 81, citing *State v. Purdin*, 2013-Ohio-22, ¶ 31 (4th Dist.). Thus, "[n]ot every intemperate remark by counsel can be a basis for reversal." *Id.* at ¶ 80, quoting *State v. Landrum*, 53 Ohio St.3d 107, 112 (1990). Therefore, "an appellate court must not focus on isolated comments but must examine the prosecution's closing argument in its entirety to determine whether the prosecutor's comments prejudiced the defendant." *Id.*, quoting *Topping* at ¶ 84, citing *State v. Treesh*, 90 Ohio St.3d 460, 466 (2001).

{¶51}   "During closing arguments, the prosecution is generally given wide latitude to convincingly advance its strongest arguments and positions."  *Martin* at ¶ 82, quoting *Topping* at ¶ 83, citing *State v. Powell*, 2012-Ohio-2577, ¶ 149. However, prosecutors also " 'must be diligent in their efforts to stay within the boundaries of acceptable argument and must refrain from the desire to make outlandish remarks, misstate evidence, or confuse legal concepts.' " *Id.*, quoting *State v. Fears,* 86 Ohio St. 3d 329, 332 (1999).  Even so, " '[p]rosecutorial misconduct constitutes reversible error only in rare instances.' " *Id.,* quoting *State v. Purdin*, 2013-Ohio-22, ¶ 31 (4th Dist.), quoting *State v. Edgington*, 2006-Ohio-3712, ¶ 18 (4th Dist.).  "Accordingly, courts ordinarily will not reverse a judgment on the basis of prosecutorial misconduct unless 'the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' " *State v. Dailey,* 2018-Ohio-4315, ¶ 38 (4th Dist.), quoting *State v. Belton*, 2016-Ohio-1581, ¶ 125, quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974).

{¶52} Lemaster's counsel did not object to the prosecutor's comments during trial. Therefore, we review only for plain error. In order to establish plain error, Lemaster "must show that (1) there was an error or deviation from a legal rule, (2) the error was plain and obvious, and (3) the error affected the outcome of the trial." *State v. Mohamed*, 2017-Ohio-7468, ¶ 26, citing *State v. Barnes*, 2002-Ohio-68, ¶ 27. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 97 (1978). Plain errors are clearly outcome-determinative. *State v. Andrews,* 2024-Ohio-5023, ¶ 51 (4th Dist.), citing *State v. Porter,* 2012-Ohio-1526, ¶ 19 (4th Dist.) and *State v. Perez,* 2009-Ohio-6179, ¶ 181. "Consequently, '[i]n the prosecutorial misconduct context, plain error exists only when the record clearly shows that in the absence of the improper comments, the jury would not have convicted the defendant.' " *Id.* citing *State v. Conley,* 2009-Ohio-1848, ¶ 27 (4th Dist.).

### B.  Analysis

{¶53} Lemaster points to comments the State made in its closing argument rebuttal that referenced P.R., asserting that the State tried to shift the burden of proof onto Lemaster. It is important for us to review these comments in context. During its first closing argument, the State explicitly said, "[t]he State's burden is to [prove] to you beyond a reasonable doubt that the [d]efendant committed the two crimes of assault and abduction." In its initial closing argument, the State referenced Lemaster's phone call to P.R. only to argue that the victim clearly understood by hearing the call that Lemaster would physically beat her or even kill her if she tried to leave.

**{¶54}** Then, in his closing argument, Lemaster's trial counsel (not the State) brought up Lemaster's conversation with P.R. that occurred during the assault and abduction, to argue the State should have had P.R. testify at trial. Counsel for Lemaster asked the jury:

> Where is [P.R.]? Do we even know this phone call took place? [The prosecutor] said, well Deputy Woods, he doesn't know what P.R.'s number is, he doesn't . . . hey, this is law enforcement, folks. They've got computers. They can hunt down anybody. P.R. lives right here in this community. I mean, how hard would it be to track her down and say hey, did this phone call even happen? Did you describe all of this stuff, did that even happen? There's another question that makes no sense.

**{¶55}** Only in response to the defense's closing argument, did the prosecutor say:

> [P.R.] could've easily came in here and said that that didn't happen, but she didn't. She didn't come in here and say anything. She wasn't a witness for anybody. So, you can give that whatever weight you want to. Um, just because she doesn't appear, doesn't mean that the victim's story is incredible.

These remarks of the prosecutor on rebuttal are the ones that Lemaster now claims were improper.

**{¶56}** The State's rebuttal argument did not imply in any way that the burden of proof was on the defendant to prove his innocence. It was, instead, a fair comment designed to meet the defense counsel's argument that the State omitted to call P.R., suggesting that P.R.'s testimony would probably benefit the defense. *See, e.g., State v. Snowden,* 2019-Ohio-3006, ¶ 117 (2d Dist.) (It was not improper comment for the prosecutor, in rebuttal, to reply to defense counsel's intimation that the State's failure to offer certain testimony did not result an inference that the testimony would be favorable to the defense). There was nothing unfair about the argument. In addition, the State's

comment that "you can give [the fact that P.R. did not testify] whatever weight you want to. . . just because she doesn't appear, doesn't mean that the victim's story is incredible," is not a misstatement of the law or a change in the burden of proof. In fact, "a conviction 'may rest solely on the testimony of a single witness, including the victim, if believed, and there is no requirement that a victim's testimony be corroborated to be believed.' " *State v. Truesdell*, 2024-Ohio-5376, ¶ 59 (1st Dist.), quoting *State v. Wright*, 2024-Ohio-851, ¶ 32 (1st Dist.).

**{¶57}** Moreover, not only did the State assert its burden of proof to prove the allegations, but the trial court also instructed the jury that the State had the burden of proof as to all the elements of its case against the defendant. We conclude that the challenged rebuttal argument was not unfair. The record does not support a finding that, absent the prosecutor's comments, Lemaster's convictions would not have occurred.

**{¶58}** We therefore overrule Lemaster's third assignment of error, as we find it to be without merit.

Fourth Assignment of Error

**{¶59}** In his fourth assignment of error, Lemaster contends he was denied his due process rights due to a *Brady* violation. He acknowledges that he was provided a law enforcement body cam, the incident report, and S.S.'s written statement, but he claims his trial counsel did not find out until the trial about S.S. taking her cell phone from his residence when law enforcement accompanied S.S. to get her belongings. His chief complaint is that the State failed to document what particular items S.S. retrieved from the camper.

**{¶60}** The State responds it did not suppress or withhold any evidence from Lemaster, and further that law enforcement was not required to conduct an inventory of the property that the victim herself removed from the camper.

## A.  Law

**{¶61}** The United States Supreme Court has held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87 (1963); *see also, State v. Osie,* 2014-Ohio-2966, ¶ 154 ("*Brady* imposes on the government an obligation to turn over evidence that is both favorable to the defendant and material to guilt or punishment. 'Materiality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial.' ").  As a matter of due process, the State's duty is "inclusive of evidence that is exculpatory of guilt, as well as evidence that serves to impeach the State's witnesses." *State v. Green,* 2024-Ohio-3260, ¶ 23 (1st Dist.), citing *Strickler v. Greene,* 527 U.S. 263, 280-281 (1999).  Whether evidence is material under *Brady* considers " ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' " *State v. Jury,* 2022-Ohio-4419, ¶ 11 (6th Dist.), quoting *Kyles v. Whitley,* 514 U.S. 419, 433 (1995), quoting *U.S. v. Bagley*, 473 U.S. 667, 682 (1985).  The U.S. Supreme Court has defined "reasonable probability" as a "probability sufficient to undermine confidence in the outcome." *Id.*, citing *Bagley* at 682 and *State v. Johnston,* 39 Ohio St.3d 48 (1989), paragraph five of the syllabus.

**{¶62}** A defendant claiming a *Brady* violation must demonstrate: "(1) the evidence is favorable to the defendant, because it is either exculpatory or impeaching, (2) the evidence was either willfully or inadvertently suppressed by the [S]tate, and (3) the defendant was prejudiced as a result." *Green* at ¶ 25, citing *State v. Brown*, 2024-Ohio-749, ¶ 30. A *Brady* claim raises issues of due process that are mixed questions of law and fact, such that the standard of review is de novo. *Id.* at ¶ 22, citing *State v. Smith*, 2018-Ohio-4691, ¶ 24-25 (2d Dist.).

## B. Analysis

**{¶63}** First, Lemaster has not shown how any particular evidence was favorable to him, because it is either exculpatory or impeaching. The tenor of Lemaster's defense at trial seemed to be that the credibility of S.S.'s testimony somehow hinged upon whether she had her cell phone when she left Lemaster's camper immediately after the offense, or whether she later retrieved the phone with the assistance of law enforcement. However, both Woods and S.S. testified at trial that she retrieved her cell phone and other belongings with the assistance of law enforcement the afternoon after the offense. As discussed above, Lemaster did cross-examine S.S. about this detail, and she did at first mistakenly say she had taken pictures of her injuries from the assault before she had contacted law enforcement, but she clarified that testimony with additional questioning.

**{¶64}** In fact, a thorough review of the evidence shows that S.S. did not have her cell phone until the next day. Thus, Lemaster's argument that an inventory would have somehow been exculpatory is sheer speculation. "Courts have consistently rejected *Brady* claims that are too speculative, requiring defendants to substantiate claims that

the evidence in question was favorable and material." *State v. Armstrong,* 2025-Ohio-2609, ¶ 28 (2d Dist.), quoting *State v. McGuire*, 2018-Ohio-1390, ¶ 28 (8th Dist.). Lemaster has not shown how an inventory showing the items S.S. retrieved from the camper is evidence favorable to him, either exculpatory or impeaching to satisfy the first prong of the *Brady* inquiry.

{¶65}  Second, Lemaster has also not shown that the State either willfully or inadvertently suppressed the evidence.  We do not see any evidence in the record to suggest that the sheriff's department, the prosecutor, or any other agent of the State had made an inventory of the personal belongings S.S. removed from the defendant's camper.  The State cannot suppress records it does not have.  " 'The fact that a defendant wishes to have materials that may or may not exist and may or may not be in the prosecutor's custody or control, does not demonstrate that such materials are *Brady* materials that the prosecutor has a duty to disclose.' "  *State v. Jury,* 2022-Ohio-4419 at ¶ 17, quoting *State v. McClurkin*, 2009-Ohio-4545, ¶ 57 (10th Dist.).  "The [S]tate does not have an obligation 'to engage in affirmative action in gathering evidence which an accused might feel necessary to his defense.  The accused must protect his own interests.' "  *Id.,* quoting *State v. Young,* 2021-Ohio-2541, ¶ 103 (12th Dist.), quoting *Kettering v. Baker*, 42 Ohio St.2d 351, 354 (1975).  Thus, " 'when the [S]tate has failed to gather exculpatory evidence or to fully investigate the allegations, the defendant may either investigate the charge and collect the evidence himself, if such evidence is available, or he may point out the deficiencies in the [S]tate's investigation at trial.' " *Id., quoting Young* at ¶ 103, quoting *State v. Farris*, 2004-Ohio-5980, ¶ 20 (2d Dist.).  In contrast, the State's duty to affirmatively gather exculpatory evidence, extends only to

that evidence obtained by those acting on the government's behalf. *Id.* at ¶ 18, citing *State v. McNeal*, 2022-Ohio-2703, ¶ 22.

{¶66} Finally, as explained, Lemaster has not shown how he was prejudiced, as the only known evidence is that the cell phone was retrieved the afternoon after the offense, which does not appear to be exculpatory. In addition, Lemaster's trial counsel attempted to impeach S.S. during the trial regarding whether she did or did not have the cell phone when she left the camper. As Woods testified, when law enforcement went with S.S. to the camper, she grabbed a cell phone, charger, and a few clothes. Presumably, an inventory would show these same items. We therefore find that Lemaster's fourth assignment of error lacks merit and hereby overrule it.

Fifth Assignment of Error

{¶67} In his fifth assignment of error, Lemaster posits that he received ineffective assistance of counsel, pointing to five specific purported errors of counsel. First, he claims his counsel was ineffective because counsel did not move for an acquittal at the conclusion of the State's case for failure to establish venue. Second, he contends his trial counsel erred by failing to object to hearsay statements of Lemaster's prior bad acts. Third, he alleges his trial counsel continually elicited incriminating statements during cross-examination. Fourth, he asserts his trial counsel should have called a "critical witness" during the trial. Fifth, he avers that his trial counsel failed to move for a continuance or mistrial once he became aware of "newly discoverable evidence," namely the testimony that S.S. obtained the cell phone from the residence over 14 hours after the incident.

**{¶68}** The State counters that Lemaster has failed to show his trial counsel's performance was deficient, mostly because these specific instances involve the defense's trial strategy.  The State also points out that even if defense trial counsel erred, the errors were not so egregious as to constitute prejudice.

A.  Law

**{¶69}** "The Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense." *State v. Hughes*, 2025-Ohio-894, ¶ 52 (4th Dist.). "The United States Supreme Court has generally interpreted this provision to mean a criminal defendant is entitled to the 'reasonably effective assistance' of counsel." *Id.*, citing *Strickland v. Washington*, 466 U.S. 668.

**{¶70}** To prove ineffective assistance of counsel, a petitioner "must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Short*, 2011-Ohio-3641, ¶ 113 (4th Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984). Therefore, "[f]ailure to establish either element is fatal to the claim." *State v. Jones*, 2008-Ohio-968, ¶ 14 (4th Dist.).

**{¶71}** "To establish prejudice, a defendant must demonstrate that a reasonable probability exists that but for counsel's errors, the result of the trial would have been different." *State v. Walters*, 2014-Ohio-4966, ¶ 24 (4th Dist.), citing *State v. White,* 82 Ohio St.3d 15, 23 (1998). " '[S]peculation is insufficient to establish the prejudice

component of an ineffective assistance of counsel claim.' " (Brackets original) *Id*.,

quoting *State v. Blackburn*, 2020-Ohio-1084, ¶ 37 (4th Dist.).

**{¶72}** "In Ohio a properly licensed attorney is presumed competent." *State v.*

*Ruble*, 2017-Ohio-7259, ¶ 47 (4th Dist.), citing *State v. Gondor*, 2006-Ohio-6679, ¶ 62.

"In order to show deficient performance, the defendant must prove that counsel's

performance fell below an objective level of reasonable representation." *State v.*

*Conway*, 2006-Ohio-2815, ¶ 95. When considering whether trial counsel's

representation amounts to deficient performance, "a court must indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable

professional assistance[.]" *Strickland*, 466 U.S. at 689.

B.  Analysis

Failure to Object to Venue

**{¶73}** Specifically, Lemaster argues on appeal that his counsel should have

moved for an acquittal, pursuant to Crim.R. 29, at the conclusion of the State's case-in-

chief for failure to prove venue.  Crim.R. 29(A) grants the trial court with authority to

enter a judgment of acquittal when the State's evidence is insufficient to sustain a

conviction.  *State v. Kilgore*, 2025-Ohio-901, ¶ 15 (5th Dist.).  However, "[a] trial court

should overrule a Crim.R. 29 motion for acquittal unless, after viewing the evidence in a

light most favorable to the State, the court finds no rational finder of fact could find the

essential elements of the charge proven beyond a reasonable doubt."  *Id. citing State v.*

*Franklin*, 2007-Ohio-4649, ¶12 (5th Dist.).

**{¶74}** Our discussion pertaining to the first and second assignments of error

addresses this issue.  The State in this case did not fail to prove venue based on direct

and circumstantial evidence.  Further, we are permitted pursuant to Evid.R. 201 to take judicial notice of cities within our district.  There was sufficient direct and circumstantial evidence of venue to require the trial court to submit the case to the jury.  Thus, the trial court would have denied a Crim.R. 29 motion had it been made.

### Failure to Object to Hearsay Statements of Lemaster's Prior Bad Acts

**{¶75}** Lemaster claims his trial counsel should have objected to certain hearsay involving prior bad acts of the defendant.  He primarily focuses on the time during the indicted incident when S.S. went inside the camper, and Lemaster called P.R. on the phone.  At trial, S.S. recounted the statements that Lemaster made during this phone call and also recounted what P.R.'s responses were, because S.S. could hear those responses.  In essence, Lemaster told P.R. to tell S.S. what would happen if S.S. put another man before him, and P.R. eventually responded that Lemaster broke her collarbone and busted out her eye socket.  P.R. also said she had to go to physical therapy for some time.  Also, according to S.S., Lemaster told P.R. that P.R. better get there, because if she didn't, he was going to "kill" S.S.

**{¶76}** While Lemaster characterizes these statements as "other acts" evidence, Evid.R. 404(B) limits only the admission of other acts evidence that is "extrinsic" to the crime charged.  *State v. Pettiford,* 2024-Ohio-4447, ¶ 36 (4th Dist.), citing *State v. Stallworth,* 2014-Ohio-4297, ¶ 37 (11th Dist.).  Evid.R. 404(B) does not apply when the acts are intrinsic, including part of the events in question.  *Id.* citing *State v. Wainscott,* 2016-Ohio-1153, ¶ 19 (12th Dist.).  " 'When other acts are 'inextricably intertwined' with [an] offense, those acts are said to be intrinsic to the alleged crime.' "  *Id.* quoting *Stallworth* at ¶ 38, quoting *U.S. v. Siegel,* 536 F.3d 306, 316 (4th Cir. 2008).  " ' "Other

acts 'are inextricably intertwined with a charged crime when they are so blended or connected with the charged crime that proof of one incidentally involves the other, explains the circumstances thereof, or tends logically to prove any element of the crime charged." ' " *Id.* at ¶ 37, quoting *State v. Crowley,* 2023-Ohio-1764, ¶ 21 (2d Dist.), quoting *State v. Sinclair,* 2003-Ohio-3246, ¶ 35 (2d Dist.).

{¶77} Here, the conversation that Lemaster had with P.R. actually constituted part of the offense, because it occurred contemporaneously with the incident and showed how Lemaster threatened S.S. This conversation was part of the State's evidence to prove abduction in that Lemaster acted "by force or threat," and also showed that he placed S.S. "in fear." This is consistent with the motion practice and pretrial evidentiary hearing in which defense counsel objected to this evidence and sought a ruling by the trial court as to whether it was admissible according to Evid. R. 401, 403(A) and 404(B). The trial court held that the phone conversation was admissible because it was made during the offense. However, Lemaster's trial counsel did not object on the basis of hearsay, even though he requested a hearing to cross-examine S.S. about this conversation before she testified at trial.

{¶78} Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Further, Evid.R. 801(D) provides that certain statements are not hearsay. One type of statement that is not hearsay is an admission of a party opponent, when the statement is "offered against a party," and is the party's own statement. In the instant case, Lemaster's own statements made during the conversation with P.R. are clearly not hearsay. Evid.R. 801(D)(2)(a).

**{¶79}** In addition, in the instant case P.R.'s statements and responses to Lemaster's phone call are not hearsay for other reasons such that trial counsel may have opted not to exercise an objection. First, the statement is not hearsay if it is not being offered to prove the truth of the matter, but instead "to show its effect on the listener." *See State v. Boyd,* 2025-Ohio-3248, ¶ 103 (6th Dist.) ("Multiple courts have held that text messages received on a defendant's cell phone are not hearsay when the messages are not offered for the truth of the matter asserted."); *State v. Thacker,* 2020-Ohio-4620, ¶ 93 (4th Dist.) ("[T]estimony which explains the actions of a witness to whom a statement was directed, such as to explain the witnesses' activities, is not hearsay.").

**{¶80}** Second, a statement is not hearsay if a defendant acknowledges a statement made by another, as it may be deemed an adoptive admission. *State v. Long,* 2014-Ohio-4416, ¶ 21 (11th Dist.) An adoptive admission is defined as "a statement of which the party has manifested an adoption or belief in its truth" and is explicitly exempted from the definition of hearsay. Evid.R. 801(D)(2)(b). *Id.* "In order for an adoptive admission to be applicable, the declarant must have made the statement in the presence of the party against whom the statement is offered at trial. In addition, the party must have heard and understood the statement, must have been free to disavow it, and must have either expressly acknowledged the truth of the statement or remained silent when a reasonable person would have denied its truthfulness." *Id. citing State v. Comstock,* 1997 WL 531304, *5 (11th Dist. Aug. 15, 1997). This includes phone conversations. *See Id.* (a recorded telephone conversation where the defendant

acknowledged a statement made by his sister was deemed an adoptive admission and therefore not hearsay).

**{¶81}** Third, P.R.'s telephone responses to Lemaster are not hearsay if the State offers them to explain the context of S.S.'s observations and behavior during the incident, as well as the context of Lemaster's statements during the offense. *See State v. Young,* 2013-Ohio-3418 , ¶ 21 (4th Dist.) (where out-of-court statement that a victim told witness some of her pills were missing assisted to explain the context of the witness' subsequent observation and behavior); *see also, State v. Crocker,* 2015-Ohio-2528, ¶ 15 (4th Dist.) (where the court explained that text messages referred to in officer's report were not hearsay because they gave context to defendant's statements).

**{¶82}** Had defense counsel objected to S.S.'s recollection of this telephone conversation on the basis of hearsay, it is likely that the trial court would have overruled it. "A defense counsel's failure to object is not ineffective assistance of counsel if the evidence is admissible." *State v. Carter*, 2018-Ohio-2238, ¶ 47 (8th Dist.). The fact counsel challenged what it at first characterized as "other acts" evidence and requested a hearing supports the conclusion that counsel's decision not to argue hearsay was based on sound strategy.

Continual Elicitation of Incriminating Statements during Cross-Examination

**{¶83}** Lemaster asserts that his trial counsel elicited harmful evidence during cross-examination. It is clear throughout the trial that the defense strategy was to point to an insufficient law enforcement investigation, and further, that S.S. was not a credible witness. "Generally, the decision regarding which defense to pursue at trial is a matter of trial strategy, and trial strategy decisions are not a basis of a finding of ineffective

assistance of counsel." *State v. Delong,* 2025-Ohio-2432, ¶ 68, quoting *State v. Craver,* 2020-Ohio-5407, ¶ 29 (2d Dist.). This is true even if a better strategy is available. *Id.* citing *State v. Stodgel,* 2024-Ohio-5182, ¶ 46 (4th Dist.).

### Failure to Call a Critical Witness

**{¶84}** Lemaster states his trial counsel was ineffective because he failed to call P.R. as a defense witness. However, "the decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Tumey*, 2019-Ohio-219, ¶ 41, quoting *State v. Pickens*, 2014-Ohio-5445, ¶ 203. Moreover, there is no evidence in the record that P.R.'s testimony would have benefited Lemaster in any way. In fact, the evidence presented shows the opposite is probably true. Under these circumstances, Lemaster cannot establish a reasonable probability of a different outcome.

### Failure to Move for a Continuance or Mistrial

**{¶85}** Lemaster also claims that he received ineffective assistance because his trial counsel failed to move for a continuance or mistrial when he learned during trial that the victim obtained a cell phone from Lemaster's residence the afternoon after the incident. Lemaster does not explain on appeal as to how this would have benefited his case, and there is no indication in the record that a continuance would have helped. As it was, the defense was able to point out an inconsistency in S.S.'s testimony when she said that she took photos upon arriving in Urbana, while at the same time saying her cell phone was left at the camper and retrieved the following afternoon.

{¶86} Despite Lemaster's various arguments regarding ineffective assistance, we do not see that he has established prejudice in any way.  As a result, we overrule his fifth assignment of error.

CONCLUSION

{¶87} For the foregoing reasons, we overrule all five assignments of error and affirm the trial court's judgment of conviction.

**JUDGMENT AFFIRMED.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Meigs County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. and Hess, J.:  Concur in Judgment and Opinion.


For the Court,


BY:     _____
                Kristy S. Wilkin, Judge


### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**